# In the United States Court of Federal Claims

No. 15-1189
(Filed:  17 February 2022)

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| MARINE INDUSTRIAL CONSTRUCTION, LLC, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| THE UNITED STATES, | * |
| | * |
| Defendant. | * |
| | * |

Summary Judgment; Termination for Default; Termination for Convenience; Conversion; Excusable Delay; Differing Site Condition; Superior Knowledge; Dredging; Reprocurement Costs; Liquidated Damages; Compensable Delay; Notice; Waiver

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Joseph A. Yazbeck, Jr.*, with whom was *David H. Bowser*, Jordan Ramis PC, all of Lake Oswego, Oregon, for plaintiff.

*Jimmy S. McBirney*, Trial Attorney, with whom were *Douglas K. Mickle*, Assistant Director, *Robert E. Kirschman, Jr.*, Director, *Joseph H. Hunt*, Assistant Attorney General, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, all of Washington, D.C., and *Anna D. Ross*, Assistant District Counsel, U.S. Army Corps of Engineers, of Seattle, Washington, for defendant.

## OPINION AND ORDER

**HOLTE**, **Judge**.

*A Perfect Storm*

The skies unrest when the government tests performance-based solicitations,
A wary dredger would fare far better if it worked with fewer hesitations,
Fighting the elements, with debris and sediments, onward the task did drag,
Before they knew it, the fish window, they blew it, so up they raised the white flag,
Motions were filed, allegations compiled, but material facts are disputed,
To trial we go so the parties may show if this perfect storm has concluded.[1]

Marine Industrial Construction, LLC ("MIC" or "plaintiff"), accuses the government of breach of implied warranty and wrongful termination for default of a waterway dredging contract

---

[1] As the parties inserted gest into earlier briefing, this Court's "A Perfect Storm" poem is a tribute to The Honorable Loren A. Smith and his full-order maritime poem published in *Neal & Co. v. United States*, 41 Fed. Cl. 584 (1998). *See also* Pl.'s Reply in Supp. of Mot. for Site View at 1, 2, 4, ECF No. 112 (quoting Hamlet).

awarded for $1,290,250.  The government counterclaims for costs related to the termination of the contract totaling $1,031,751.50, plus interest.  The Court bifurcated the motions contained within the cross-motions for summary judgment to first address four issues relating to the timeliness of evidentiary objections, exhibit authentication, designating a witness as an expert, and the admissibility of certain statements.  The Court decided those four issues on 29 December 2020, conducted a site visit on 4 October 2021, and held argument on the remaining issues on 5 October 2021.  This Order decides all remaining issues contained within the cross-motions for summary judgment.  For the following reasons, the Court grants in part and denies in part plaintiff's motion for summary judgment and grants in part and denies in part the government's cross-motion for summary judgment.

## I.      Factual History[2]

### A.       A Perfect Storm Brews

On 25 July 2014, the U.S. Army Corp of Engineers ("USACE" or "the government") issued Solicitation W912DW-14-B-0008 ("the solicitation"), for hydraulic dredging at the Quillayute River Waterway in La Push, Washington ("the waterway").  Def.-Counterclaimant's Opp'n to Pl.'s Mot. for Summ. J. and Cross-Mot. for Summ. J. ("Def.'s Cross-MSJ") at 3, ECF No. 83 (citing App. to Def.'s Cross-MSJ ("Def.'s Cross-MSJ App.") at 131–280 (Contract, FY14 Maintenance Dredging Quillayute River Waterway, La Push, Washington, Contract Number W192DW-14-C-0024)).  The solicitation warned against dangerous weather conditions and some debris in the dredging area. *Id.* at 3–5 (citing Def.'s Cross-MSJ App. at 165, 193, 263, 273, 282 (the solicitation)).  The solicitation urged bidders to perform a site visit to inspect "the character, quality, and quantity of surface and subsurface materials or obstacles to be encountered insofar as this information is reasonably ascertainable from an inspection of the site." *Id.* at 5 (citing Def.'s Cross-MSJ App. at 165 (the solicitation)).  The solicitation informed prospective bidders the government had no knowledge of "artificial obstructions" that would require "additional equipment for economical removal."  Decl. of David H. Bowser in Supp. of Pl.'s Mots. for Summ. J. ("Bowser Decl.") Ex. K at 1, ECF No. 80-10 (2014 solicitation).

The government procures dredging services of the waterway typically every two to three years.  Cross-MSJ Oral Arg. Tr. ("Tr.") at 20:24–21:8, ECF No. 121.  In 2014, however, the solicitation for these services was markedly different from past years. *See* Ex. K (comparison of solicitations from 2014, 2011, 2009, 2007, 2003, and 2002).  The government moved "from a design-based specification to a more performance-based specification."  Tr. at 197:19–198:25 (government counsel explaining the changes in 2014).  The government "streamlined" the solicitation by removing certain disclaimers and requirements to bid on the contract. *Id.*; Def.'s Cross-MSJ at 42.  In particular, the government removed warnings of sunken boats, fishnets, steel trolling wire, and machinery—all likely to cause frequent downtime. *Compare* Ex. K at 1–2 (2014 solicitation), *with id.* at 9–10 (2011 solicitation), *and id.* at 13 (2009 solicitation).  The government also removed precipitation information for the area and warnings about the resultant

---

[2] All facts in this section are undisputed, unless stated otherwise. *See* Rules of the Court of Federal Claims ("RCFC") 56(a) (requiring a movant for summary judgment to show "there is no genuine dispute as to any material fact").  The Court draws all inferences "in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986).

"fast currents" carrying "[l]arge logs and trees" likely to arise "with little warning" and cause damage to equipment. *Id.* Additionally, the government added a boat basin to the scope of the solicitation—a portion of the waterway that had not been dredged in full since 1982. Bowser Decl. Ex. J at 73, ECF No. 80-9 (the resolicitation stating, "[p]ortions of the marina boat basin have not been dredged since 1982.").

Plaintiff submitted the lowest bid on 25 August 2014. Def.'s Cross-MSJ at 7. Plaintiff has over 60 years of experience dredging ports, rivers, and waterways, averaging 200,000 cubic yards dredged annually. Decl. of Joseph Bernert in Supp. of Pl.'s Mots. for Summ. J. ("Bernert Decl.") Ex. H at 63–64, ECF No. 81-1 (plaintiff's interrogatory response). On numerous government dredging contracts, plaintiff received an "excellent" contract performance rating. *Id.* at 64. Plaintiff owns all its dredging equipment, including pumps, augers, and clamshells. Tr. at 12:10–13:2 (plaintiff's counsel explaining MIC does not have to rent equipment). Despite plaintiff's experience as a veteran dredging contractor, plaintiff did not perform a site visit to inspect surface and subsurface materials prior to submitting its bid, although this was its "usual practice." Def.'s Cross-MSJ at 5 (citing Def.'s Cross-MSJ App. at 405 (deposition of MIC employee Michael Eakin at 29:9–11 (excerpts) (stating "nobody from MIC did a site visit prior" to plaintiff submitting its bid)), 356–57 (deposition of MIC co-owner Joseph Bernert at 22:22–23:9 (excerpts) (confirming plaintiff's "usual practice" is to "walk a job"))); Tr. at 10:15–19 (plaintiff's counsel explaining plaintiff possessed "internal knowledge" of the site from a job years prior). Plaintiff also did not review bidder inquiries in the solicitation, although it usually did so. Def.'s Cross-MSJ at 6 (citing Def.'s Cross-MSJ App. at 314–16 (deposition of MIC employee Michael Harrison at 121:19–123:12 (excerpts) (testifying reviewing the bidder inquiries "most likely" would have "impacted [his] decision to either make the bid or how much [he] bid")), 359 (deposition of MIC co-owner Joseph Bernert at 25:2–13 (excerpts) (testifying plaintiff would "usually look at bidder inquiries that come in during the solicitation"))).

Plaintiff's low bid won the solicitation; the government sent plaintiff a letter requesting it confirm its bid in writing. *Id.* at 7–8 (citing Def.'s Cross-MSJ App. at 1–130 (contract), 449 (USACE letter to MIC seeking verification of bid (advising plaintiff its bid was "31% below the Independent Government Estimate (IGE) and significantly lower than all other bids," asking it to "verify its bid in writing," to check for errors, and describing debris)). Plaintiff moved ahead without adjusting its submission. *Id.* at 9 (citing Def.'s Cross-MSJ App. at 295 (deposition of MIC employee Michael Harrison at 66:6–17 (excerpts)), 397 (deposition of MIC President David Bernert at 36:11–37:3 (excerpts)), 410 (deposition of MIC employee Michael Eakin at 40:9–14 (excerpts))). The government awarded plaintiff the contract on 12 September 2014. *Id.* (citing Def.'s Cross-MSJ App. at 413 (deposition of MIC employee Michael Eakin (excerpts))).

**B.    The Perfect Storm Strikes**

The USACE held a preconstruction conference with plaintiff on 24 September 2014, at which the USACE issued a notice to proceed. *Id.* at 10; Tr. at 116:3–7 (government counsel indicating work conditions in the fall are better than winter). The notice to proceed triggered a fourteen-day deadline for plaintiff to provide certain required pre-dredging submittals to the USACE and a 150-day deadline to complete the project. Def.'s Cross-MSJ at 10 (citing Def.'s Cross-MSJ App. at 39, 75–77 (contract)). Plaintiff did not provide its final submittal until 10

November 2014, more than one month after the 8 October 2014 deadline.  *Id.* at 12–13 (citing Def.'s Cross-MSJ App. at 423–24 (deposition of MIC employee Michael Eakin at 72:20–73:21 (excerpts)), 525 (FY2014 Dredging Project Submittal Register), 464 (USACE email to plaintiff on 14 October 2014, "we really need to see the remaining submittals soon"), 466 (USACE email to plaintiff on 17 October 2014, "We have not received your submittals (14 days from NTP has long past) . . . .  We have not heard from you regarding these submittals . . . .  The weather and marine conditions will continue to get worse as time slips by . . . .")).  The USACE approved plaintiff to begin dredging the same day, 10 November 2014, Def.'s Cross-MSJ App. at 525; then on 18 November 2014, plaintiff began dredging the water way.  Tr. at 63:18–25 (plaintiff's counsel explaining MIC began dredging the outer channel before encountering weather conditions that made dredging the outer channel not ideal).

Following this delayed start, plaintiff immediately experienced further delays to its dredging.  On 19 November 2014, plaintiff encountered its first storm event causing six days of delay to its operation.  Pl.'s Suppl. Brief in Supp. of its Mots. for Summ. J. ("Pl.'s Suppl. Br.") at 2, ECF No. 104 (citing Bernert Decl. Ex. M, ECF No. 81-3 (weather logs and reports of the first storm event)).  Plaintiff faced six more storm events over the remainder of the contract period.  *Id.*  Plaintiff encountered additional delays related to problems with its equipment, including a faulty crane and dredging pumps.  Def.'s Cross-MSJ at 13–15 (citing Def.'s Cross-MSJ App. at 485–86 (MIC internal email regarding La Push project failures), 501 (MIC internal email regarding equipment issues)).  More delays ensued when floating logs damaged plaintiff's discharge pipes.  *Id.* at 15–16 (first citing Pl.'s Mots. for Summ. J. ("Pl.'s MSJ") at 17–20, ECF No. 79; and then citing Def.'s Cross-MSJ App. at 311–13 (deposition of MIC employee Michael Harrison at 114:20–116:15–21 (excerpts)), 419 (deposition of MIC employee Michael Eakin at 66:19–25 (excerpts))).  Plaintiff also created delays of its own by taking extended breaks from dredging the waterway throughout the contract period.  *Id.* at 18 (citing Def.'s Cross-MSJ App. at 425–26 (deposition of MIC employee Michael Eakin at 76:12–77:12 ("those breaks [were] longer than would normally be expected under these circumstances"))).

On 30 December 2014, without finishing the inner and outer channels of the waterway, plaintiff began dredging the boat basin.  Second Suppl. Decl. of David H. Bowser in Supp. of Pl.'s Reply & Resp. ("Second Bowser Decl.") Ex. W at 12, 63 (the Quileute Tribe expressing the importance of dredging the boat basin during this contract), ECF No. 88-2; Tr. at 66:23–67:9 (plaintiff's counsel explaining MIC stopped dredging to start on the boat basin as soon as possible).  The dredging delays worsened.  On a near daily basis for the following two months of dredging, plaintiff encountered debris in the boat basin that clogged and disabled plaintiff's dredging equipment.  *See* Bernert Decl. Ex. L, ECF No. 81-2 (daily construction reports from November 2014 to February 2015).  Plaintiff also encountered clay in the basin it was ill-equipped to dredge.  Tr. at 103:21–105:11 (explaining the difficulty of dredging clay without a cutterhead, "it's like using a straw in . . . ice cream").  Examples of the debris plaintiff attempted to suction up include tires, rubber, wire, plastic, hose, metal, boat parts, nets, and cable.  *See* Ex. L (daily construction reports from November 2014 to February 2015).  The various debris would "plug[] up the Toyo pumps" or get "wrapped up in the auger of the Mud Cat."  Tr. at 19:8–15.  "[A]t a minimum, [plaintiff] would [then] have to raise up the equipment to take [the debris] out" of its equipment.  Tr. at 19:21–22.  Occasionally, the debris would make it through the equipment, only to create a clog in plaintiff's discharge pipe, forcing plaintiff to cease

dredging "to raise up a section of the sunken pipe and try to get it out." Tr. at 20:1–11.  Each stoppage would often cost plaintiff hours.  *See* Ex. L (daily construction reports from November 2014 to February 2015).  Plaintiff attempted to remedy the problem by using a mechanical clamshell to remove the debris, but the USACE denied the request "due to the environmental constraints." Tr. at 18:3–13.  Plaintiff was unfortunately without access to a cutterhead dredge, which may have been the solution to its problem.  Tr. at 13:7, 92:16–19, 103:21–104:5 (quoting USACE project manager John Pell, "[without a cutterhead, i]t doesn't pump as efficiently").

On 13 January 2015, the government issued a cure notice.  Def.'s Cross-MSJ at 19 (citing Def.'s Cross-MSJ App. at 508 (USACE cure notice letter to MIC)).  Plaintiff initially responded on 21 January 2015 with a list of actions it was taking to improve production; the next day, plaintiff sent another letter alleging differing site conditions.  *Id.* (citing Def.'s Cross-MSJ App. at 509–10 (MIC letter to USACE responding to cure notice), 511–17 (MIC letter to USACE labeled Serial Letter 0001)).  This allegation was related to unexpected debris in the boat basin but said nothing about weather or clay content.  *Id.* (citing Def.'s Cross-MSJ App. at 511–17 (MIC letter to USACE labeled Serial Letter 0001)).  Plaintiff continued to perform behind schedule, and the government issued a show cause letter on 29 January 2015.  *Id.* at 20 (citing Def.'s Cross-MSJ App. at 518–19 (USACE letter to MIC inviting MIC to show cause why USACE should not terminate the contract for default)).  The government ultimately terminated the contract for default on 27 February 2015.  *Id.* (citing Def.'s Cross-MSJ App. 520–21 (USACE letter terminating the contract for default)).  This termination was 156 days into the project, six days past the deadline; plaintiff had dredged 13,011 cubic yards of the required 79,000.  *Id.* (citing Second Am. Compl., ECF No. 20, Ex. 2 at 8).

C.    **The Aftermath of The Storm**

On 1 March 2015, "the fish window open[ed]."  Tr. at 111:8–23.  The "fish window" is the annual period between 1 March and 1 September when no dredging can occur due to "environmental concerns" related to local species of fish.  *Id.*  Due to the "fish window," the waterway dredging remained unfinished for six months while the government issued a new solicitation for the contract.  *See* Ex. J (2015 resolicitation).

The solicitation for 2015, Solicitation W912DW-15-B-0014 ("the resolicitation"), had critical differences compared to the 2014 solicitation plaintiff bid on.  *Compare* Def.'s Cross-MSJ App. at 131–280 (2014 solicitation), *with* Ex. J (2015 resolicitation).  For example, the resolicitation made prior dredging records and bathymetric soundings available for review.  Ex. J at 10 (2015 resolicitation).  In the resolicitation, the government included the pre-2014 warnings about precipitation for the area and the resultant "fast currents" carrying "[l]arge logs and trees" likely to arise "with little warning" and cause damage to equipment.  *Id.* at 11.  The government warned in the resolicitation of debris in the boat basin, such as sunken vessels, and stated "[p]ortions of the marina boat basin have not been dredged since 1982." *Id.* at 73.  The resolicitation added a minimum discharge pipe size of twelve inches and required the use of a cutterhead suction dredge.  *Id.* at 78.  The resolicitation further warned of the presence of wire, metal debris, rope, fishing nets, and tires, as well as a change in disposal site.  *Id.* at 78, 82.  The resolicitation, on its face, stated clay is present in the waterway and removed the requirement that the contractor remove any sunken vessels.  *Id.* at 78–79.  Dredging could begin more quickly

following the fish window under the structure of the resolicitation. Def.'s Cross-MSJ App. at 131–280 (2014 solicitation); Tr. at 61:10–13 (government counsel explaining the process allowed for the work to begin as soon as the environment window opened in early September). The 2014 solicitation contained none of the notices found in the resolicitation. Tr. at 96:22–97:1 (regarding the 2014 solicitation, "THE COURT: . . . [T]his procurement was changed with less warnings or concerns in order to increase bidding, correct? [GOVERNMENT]: That was the goal.").

On 27 August 2015, the government awarded the resolicitation to the reprocurement contractor who had "predominantly dredged" the waterway "for many years" before plaintiff's 2014 contract. Def.'s Cross-MSJ App. at 524 (2015 contract milestones); Tr. at 93:21–23. The reprocurement contractor began dredging with a cutterhead on 25 September 2015. Def.'s Cross-MSJ App. at 524 (2015 contract milestones); Tr. at 94:1 (plaintiff's counsel explaining the reprocurement contractor used its own cutterhead dredge). On 5 November 2015, the reprocurement contractor finished the job; it did so for "nearly $7,000 less than the contract awarded to [plaintiff]." Def.-Counterclaimant's Reply in Supp. of Cross-Mot. for Summ. J. ("Def.'s Reply") at 23, ECF No. 90; Tr. at 90:7–18 (government counsel stating, "I'm sure [plaintiff's dredging] made it a little bit easier [for the reprocurement contractor].").

While the government reprocured the dredging contract, on 1 July 2015, plaintiff requested a Contracting Officer's Decision on four claims to costs and delay days for: (1) the period between contract award and notice to proceed issuance; (2) severe weather and log traffic; (3) miscellaneous debris; and (4) clay content. Ex. T at 1, ECF No. 85-2 (Contracting Officer's Decision). On 15 April 2016, the contracting officer issued his final decision, finding plaintiff was not entitled to any of its claimed relief. *Id.* at 18.

## II.    Procedural History

On 13 October 2015, plaintiff sued the government for breach of contract, arguing the government wrongfully terminated the contract because plaintiff's delay was excusable. *See* Compl. at 1–3, ECF No. 1. Plaintiff requested the Court "[c]onvert[] the [government's] termination for default to a termination for convenience" and "award[] [plaintiff] fees pursuant to the Equal Access to Justice Act." *Id.* at 3. Plaintiff filed a first amended complaint on 1 July 2016 and sought "$638,260.81 in additional costs caused by USACE's breach of warranty, the differing site conditions encountered, and USACE's failure to disclose its superior knowledge," plus interest and fees, along with additional time to perform the contract. *See* First Am. Compl. at 7, ECF No. 10. On 16 January 2017, plaintiff filed a second amended complaint. *See* Second Am. Compl. This complaint asserts three counts: (1) breach of contract for denial of a valid claim, requesting the Court find plaintiff encountered 117.5 days of excusable delay and award plaintiff $638,260.81 and "an additional 80.5 days to complete the work"; (2) breach of contract for improper termination of default, requesting the Court convert the government's termination for default "to a termination for convenience"; and (3) breach of contract for improper demand of payment, requesting the Court find the government's demand for $1,031,751.50 wrongful and set it aside. *Id.* at 7–9. On 6 July 2018, the government filed a first amended answer to plaintiff's second amended complaint and asserted a counterclaim for $1,031,751.50 plus interest for "excess reprocurement costs, administrative costs and liquidated damages demanded by the

contracting officer's final decision . . . ."  First Am. Answer to Second Am. Compl. and Countercl. at 9, ECF No. 31.  On 13 August 2018, plaintiff answered the government's counterclaim.  *See* Pl.'s Answer to Def.'s Countercl., ECF No. 40.

Plaintiff moved for summary judgment on 4 May 2020 on the three counts in its second amended complaint.  *See* Pl.'s MSJ.  Also, on 4 May 2020, plaintiff supplemented its motion for summary judgment with two declarations and various attached exhibits.  *See* Bowser Decl., ECF No. 80; Bernert Decl., ECF No. 81.  On 3 June 2020, the government filed an objection to inadmissible evidence regarding statements in the two declarations plaintiff offered in support of its motion for summary judgment.  *See* Def.-Counterclaimant's Objs. to Inadmissible Evidence Offered in Support of Pl.'s Mot. for Summ. J. ("Def.'s Objs."), ECF No. 82.  The government objected to parts of the Declaration of Joseph Bernert, vice president and co-owner of MIC, ECF No. 81, and Exhibit H to the Declaration of Joseph Bernert, ECF No. 81-1.[3]  *Id.*  The government objected to certain statements of Mr. Bernert and alleged they were based on information contained in academic literature, hearsay not within the record, and allegations beyond his personal knowledge.  *Id.*  The government also objected to Exhibit H as inadmissible hearsay not within any exception and to parts of Exhibit H as containing inadmissible lay witness opinion.  *Id.*  On 4 June 2020, the government filed a response to plaintiff's motion for summary judgment and cross-motion for summary judgment on the three counts in plaintiff's second amended complaint and the counterclaim in its first amended answer.  *See* Def.'s Cross-MSJ at 26, 46.

On 17 June 2020, plaintiff filed a response to the government's objections, which requested the Court strike the government's objections to its declarations as untimely, defended Mr. Bernert's testimony as proper Rule 701 lay witness opinion, and, alternatively, moved to designate Mr. Bernert as an expert witness.  *See* Pl.'s Mot. Strike Def.'s Objections as Untimely, Opp'n in Resp. to Def.'s Objs. to Inadmissible Evidence Offered in Supp. of Pl.'s Mots. for Summ. J., and Alternative Mot. to Designate Expert ("Pl.'s Mot. Strike Def.'s Objs."), ECF No. 84.  On 24 June 2020, the government replied in support of the timeliness of its objections, argued Mr. Bernert should not be able to give lay testimony, and stated it was too late in the proceedings for plaintiff to declare Mr. Bernert an expert witness.  *See* Def.-Counterclaimant's Reply in Support of Objs. to Inadmissible Evidence Offered in Support of Pl.'s Mot. for Summ. J., ECF No. 86.  On 27 June 2020, plaintiff replied in support of its motion for summary judgment and in response to the government's motion for summary judgment.  Pl.'s Consolidated Reply in Supp. of Its Mots. for Summ. J. and Resp. Against Def.'s Mots. for Summ. J. ("Pl.'s Reply"), ECF No. 87.  Plaintiff also argued the Court should not consider the government's attachments and exhibits at the summary judgment stage because the government had not authenticated any of the attachments to its motions.  *Id.* at 2.  On 10 July 2020, the government replied in support of its cross-motion for summary judgment.  *See* Def.'s Reply.

As the parties' counsel agreed, the Court bifurcated the motions contained within the cross-motions for summary judgment and addressed the four pending evidentiary issues prior to

---

[3] The government objected to "Exhibit H to the Declaration of David Bowser, Dkt. No. 80" on the first page of its objection brief, but Item II on page 2 of the brief is directed to "Declaration of David Bowser, Exhibit H, Dkt. No. 81-H)."  Def.'s Objs. at 1–2.  Exhibit H is attached to the Declaration of Joseph Bernert, ECF No. 81 on the CM-ECF docket.  The government clarified during oral argument it made an error confusing ECF No. 81 with ECF No. 80.  *See* Evidentiary Oral Arg. Tr. at 40:14–41:2, ECF No. 96.

the summary judgment motions. *See* Order, ECF No. 93.  On 23 September 2020, the Court held oral argument on the four issues, and on 29 December 2020, the Court ruled on them. *See* Evidentiary Oral Arg. Tr.; Order, ECF No. 100.  The Court denied plaintiff's motion to strike the government's objections, denied plaintiff's objection to the government's exhibits for lack of authentication, denied plaintiff's motion to designate its witness as an expert, and granted as to certain sections the government's request that the Court disregard alleged inadmissible statements.  Order at 1.  In effect, the Order rendered inadmissible paragraphs 4E and 5–12 of Joseph Bernert's Declaration. *Id.* at 26; *see* Bernert Decl.  The Court further decided it will not consider declaration statements taken from Exhibit H, Interrogatory No. 9, and any other statements in Exhibit H containing analysis of weather patterns and sediment content not based on personal knowledge.  Order at 26.  The parties then requested supplemental briefing on the cross-motions for summary judgment in a joint status report ("JSR"), which the Court ordered on 24 February 2021. *See* JSR, ECF No. 101; Order, ECF No. 103.  On 31 March 2021, plaintiff filed its supplemental brief, noting the Court's 29 December 2020 Order did not eliminate any of plaintiff's motions for summary judgment and had no impact on its earlier reply in support of its motion for summary judgment and in response to the government's motion for summary judgment.  Pl.'s Suppl. Br. at 1, 6.  On 14 April 2021, the government filed its response to plaintiff's supplemental brief. *See* Def.-Counterclaimant's Resp. to Pl.'s Suppl. Br. in Supp. of Mots. for Summ. J. ("Def.'s Suppl. Br."), ECF No. 105.  On 22 June 2021, plaintiff filed its reply supplemental brief. *See* Pl.'s Reply Suppl. Brief, ECF No. 109.

On 22 June 2021, plaintiff filed a motion requesting the Court "conduct a viewing of the project site at La Push, Washington, namely the Boat Basin, Inner Channel, and Outer Channel in order to aid its understanding of the arguments raised by [d]efendant regarding what could be observed during any pre-bid site view."  Pl.'s Mot. for Site View at 4–5, ECF No. 110.  The government filed its response in opposition to the motion for site view on 2 July 2021, and plaintiff filed its reply on 13 July 2021. *See* Def.-Counterclaimant's Opp'n to Pl.'s Mot. for Site View, ECF No. 111; Pl.'s Reply in Supp. of Mot. for Site View, ECF No. 112.  On 23 July 2021, the Court granted MIC's motion for site view, finding "[a] site visit w[ould] help the Court understand unique conditions at the project location, such as the topography of the river and basin at issue, and add context to the photographic evidence included in the briefing."  Order at 7, ECF No. 113.  The parties filed a JSR on 30 July 2021 proposing early October for the site visit.  JSR at 1, ECF No. 114.  The parties confirmed in a status conference on 30 August 2021 an October site visit would present the same conditions as what could have been observed during any pre-bid site viewings in August 2014. *See* Order, ECF No. 115.  On 24 September 2021, the parties filed a JSR including numerous photographic exhibits and a map with agreed upon points of interest to guide the Court on the site visit and explain how the various locations relate to the parties' summary judgment briefing. *See* JSR Re Site Visit Plan, ECF No. 119.  The Court then conducted a site visit of the project site at La Push, Washington, on 4 October 2021 and held oral argument on the cross-motions for summary judgment on 5 October 2021 in Seattle, Washington.

## III.    Summary of the Parties' Cross-Motions for Summary Judgment

Pending before the Court are the parties' cross-motions for partial summary judgment. *See* Pl.'s MSJ; Def.'s Cross-MSJ.  On 29 December 2020, the Court ruled on four evidentiary

issues which were bifurcated from the motions. *See* Order. All the parties' motions for summary judgment remain. *See* Order; Pl.'s Suppl. Br.

Plaintiff submits nine motions for summary judgment for the Court's review. *See* Pl.'s MSJ at 1–2. First, plaintiff seeks summary judgment on the government's counterclaim for excusable delay due to unusually severe weather. *Id.* at 1. Second, plaintiff seeks summary judgment on the government's counterclaim on account of the government's "substantial and material changes in the reprocurement solicitation by, in part, limiting the available equipment that could be used and reinserting substantial and material warnings that increased the costs of performance." *Id.* Third, plaintiff seeks partial summary judgment in favor of its breach of contract claim and the government's counterclaim due to the clay it encountered, a differing site condition, within the materials dredged. *Id.* Fourth, plaintiff seeks partial summary judgment in favor of its breach of contract claim and the government's counterclaim because it encountered man-made debris and sunken vessels, a differing site condition, in the dredging area. *Id.* Fifth, plaintiff seeks partial summary judgment in favor of its breach of contract claim and the government's counterclaim for the government withholding superior knowledge of a minimum necessary pipe size. *Id.* Sixth, plaintiff seeks partial summary judgment in favor of its breach of contract claim and the government's counterclaim for the government withholding its superior knowledge of "floating log traffic through the project site during weather events that would damage equipment." Pl.'s MSJ at 1. Seventh, plaintiff seeks partial summary judgment in favor of its breach of contract claim and the government's counterclaim for the government withholding superior knowledge of man-made debris and sunken vessels in the dredging area. *Id.* at 2. Eighth, plaintiff seeks partial summary judgment in favor of its breach of contract claim and the government's counterclaim because the government withheld superior knowledge of clay in the dredging area. *Id.* Ninth, plaintiff seeks partial summary judgment on the government's liquidated damages claim, because they are a penalty as applied to the fish window. *Id.*

The government cross-motions for summary judgment on each of plaintiff's nine grounds for summary judgment and adds six additional motions of its own. Def.'s Cross-MSJ at ii–iii. The government's first motion for summary judgment requests the Court to find plaintiff was in default when the government terminated the contract. *Id.* at 24. Second, the government motions for summary judgment on plaintiff's claim of compensable delay due to plaintiff's own concurrent delays. *Id.* at 26. Third, the government motions for summary judgment on plaintiff's entitlement to convert its termination for default due to plaintiff's failure to comply with the contract's notice provisions. *Id.* at 27. Fourth, the government motions for summary judgment on plaintiff's claim to unforeseeable delay due to weather because plaintiff cannot prove the weather was unusually severe, unforeseeable, or that plaintiff was without fault or negligence. *Id.* at 29, 32. Fifth and sixth, the government motions for summary judgment on plaintiff's claims to differing site conditions due to clay and debris as plaintiff cannot satisfy the required elements for the claims. *Id.* at 33–41. In its seventh motion for summary judgment the government asks the Court to find the government did not withhold superior knowledge of a 12" minimum pipe size. Def.'s Cross-MSJ at 41–43. Eighth, ninth, and tenth, the government motions for summary judgment on plaintiff's superior knowledge claims related to floating logs, debris, and clay because information regarding all three was reasonably available to bidders. *Id.* at 43–45. Eleventh, the government motions for summary judgment on the validity of the termination for default since, even if given all the claimed excusable delay, plaintiff still would

not have finished the contract. *Id.* at 46. Twelfth, the government motions for summary judgment on its claim for reprocurement costs arguing the reprocurement contract was not materially altered, no change impacted the contract price, and plaintiff does not dispute the costs claimed. *Id.* at 48. Thirteenth, the government motions for summary judgment on its claim for administrative costs as they are undisputed. *Id.* at 48. Fourteenth, the government moves for summary judgment on its liquidated damages as to the work window because they are undisputed. Def.'s Cross-MSJ at 49. Fifteenth, the government moves for summary judgment on its liquidated damages as to the fish window since plaintiff cannot meet its burden of challenging the agreed upon provision. *Id.* at 50.

## IV.   Summary Judgment Standard

Summary judgment is appropriate where the evidence demonstrates there is "no genuine dispute as to any material fact and that the movant is entitled to judgement as a matter of law." RCFC 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A genuine issue is one that "may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. A fact is material if it might significantly affect the outcome of the suit. *Id.* at 248. In determining if summary judgment is appropriate, a court will draw all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. A party seeking summary judgment bears the burden of establishing the "absence of any genuine issues of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting *Catrett v. Johns-Manville Sales Corp.*, 756 F.2d 181, 184 (D.C. Cir. 1985), *rev'd sub nom. Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)).

When the moving party has met this burden, the burden shifts and the nonmovant must point to sufficient evidence to show a dispute exists over a material fact allowing a reasonable fact finder to rule in its favor. *Anderson*, 477 U.S. at 256–57. The evidence need not be admissible, but mere denials, conclusory statements, or evidence that is merely colorable or not significantly probative will not defeat summary judgment. *Celotex*, 477 U.S at 324.

This Court reviews an agency's termination for default *de novo*. 41 U.S.C. § 7104(b)(4); *see also Seaboard Lumber Co. v. United States*, 903 F.2d 1560, 1562 (Fed. Cir. 1990). "In determining whether a default termination was justified, a court must review the evidence and circumstances surrounding the termination, and that assessment involves a consideration of factual and evidentiary issues." *McDonnell Douglas Corp. v. United States*, 323 F.3d 1006, 1014 (Fed. Cir. 2003). "As a general matter, government contracting officers have 'broad discretion to determine whether to terminate a contract for default.'" *Allen Eng'g Contractor Inc. v. United States*, 611 F. App'x 701, 705 (Fed. Cir. 2015) (quoting *Lanterman v. United States*, 75 Fed. Cl. 731, 733–34 (2007)).

## V.   Whether Plaintiff was in Default at Termination

The government begins its cross-motion for summary judgment by asserting plaintiff was in default at the time USACE terminated the contract. Def.'s Cross-MSJ at 24. The government claims: "As of one day before the contractual completion deadline, it would have taken [plaintiff] another 780 days of non-stop dredging at its total rate of production for [plaintiff] to

complete the project." *Id.* Unless plaintiff can prove both its default was excusable and it would have completed the contract but for the excusable delays–the government argues its termination for default was appropriate as a matter of law. *Id.* at 24–25.

Plaintiff argues it was not in default at termination so long as it "can prove that its default was excusable." Pl.'s Reply at 8 (quoting Def.'s Cross-MSJ at 24). Plaintiff claims "[e]xcusable delay precludes default." *Id.* In addition, plaintiff argues the government's cited cases do not support the proposition that plaintiff must demonstrate it would have completed the contract but for the excusable delay. *Id.* at 8–9. The government replies plaintiff's purported disagreement on this issue "is illusory," because plaintiff does not argue it was not in default, rather plaintiff argues its default was excusable. Def.'s Reply at 3.

When a contractor challenges a default termination, the government bears the initial burden of showing the contractor was in default at the time the contract was terminated. *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed. Cir. 1987). "A contractor's failure to make timely delivery of agreed-upon goods establishes a prima facie case of default." *Gen. Injectables & Vaccines, Inc. v. Gates*, 519 F.3d 1360, 1363 (Fed. Cir.), *opinion supplemented on denial of reh'g,* 527 F.3d 1375 (Fed. Cir. 2008) (citing *Nuclear Rsch. Corp. v. United States*, 814 F.2d 647, 650 (Fed. Cir. 1987)). The parties' contract in this case incorporates by reference FAR 52.249-10(a), which states a contractor is in default when it "fails to prosecute the work . . . , with the diligence that will insure its completion within the time specified in th[e] contract." *See* Def.'s Cross-MSJ App. at 15 (contract). In such an event, "the Government may, by written notice to the [c]ontractor, terminate the right to proceed with the work . . . that has been delayed." FAR 52.249-10(a). "The burden then shifts to the contractor to show that the failure to deliver the contract goods was excusable." *Gen. Injectables & Vaccines*, 519 F.3d at 1363 (citing *DCX, Inc. v. Perry*, 79 F.3d 132, 134 (Fed. Cir. 1996)).

Plaintiff's contract with the USACE to dredge the waterway required it to dredge an estimated 79,000 cubic yards within 150 days of the notice to proceed, but no later than 28 February 2015. Second Am. Compl. Ex. 2 at 8; Pl.'s Reply at 10; Def.'s Cross-MSJ at 8, 24. As of 27 February 2015, 156 days after the notice to proceed—six days past the deadline—plaintiff dredged 13,011 of the 79,000 cubic yards. Second Am. Compl. Ex. 2 at 8; Pl.'s Reply at 10; Def.'s Cross-MSJ at 24; Def.'s Cross-MSJ App. at 139 (2014 solicitation). Although the parties dispute how many additional days plaintiff needed to complete the contract, no party argues plaintiff finished dredging within the allotted 150 days or would have finished dredging by 28 February 2015. Pl.'s Reply at 10 (arguing 117.5 additional days would be sufficient); Def.'s Cross-MSJ at 24 (arguing 780 more days was needed). Plaintiff even conceded it was "not in compliance with the contract at the time of termination." Tr. at 155:2–12 (plaintiff's counsel stating, "we're not arguing that February 28th, all work was done"). Accordingly, the Court finds no dispute of material fact that plaintiff was in default at the time the USACE terminated the contract.[4] *Lisbon Contractors, Inc.*, 828 F.2d at 765; *Matsushita*, 475 U.S. at 587. The Court grants the government's motion for summary judgment on this issue. Def.'s Cross-MSJ at 24.

---

[4] For the first time at oral argument, plaintiff argued the termination for default was an abuse of discretion by the contracting officer and an arbitrary and capricious decision. Tr. at 106:6–110:11 (discussing the standard for invalidating a termination for default, "[THE COURT:] Does MIC make that argument in its briefs? [PLAINTIFF]:

## VI.     Whether Conversion to Termination for Convenience is Warranted

After finding the government carried its initial burden of showing plaintiff was in default at the time the contract was terminated, the burden shifts to plaintiff to prove its default was excusable.  *See supra* Section V; *Lisbon Contractors, Inc.*, 828 F.2d at 765; *Gen. Injectables & Vaccines*, 519 F.3d at 1363 (quoting FAR 52.212-4(f)) (an excusable delay is "caused by an occurrence beyond the reasonable control of the [c]ontractor and without its fault or negligence").  Plaintiff moves for summary judgment on various grounds for excusable delay and breach of contract to justify converting the government's termination for default into a termination for convenience.  Pl.'s MSJ at 1–2; *see* Second Am. Compl. at 8; *see Engineered Maint. Servs., Inc. v. United States*, 55 Fed. Cl. 637, 641 (2003) (citing FAR 49.201) ("For terminations of convenience, the parties will seek to negotiate an agreement that will compensate the contractor . . . for the work done and preparations made for the terminated portion of the contract."), *aff'd*, 89 F. App'x 267 (Fed. Cir. 2004).  The government likewise moves for summary judgment on these issues "[b]ecause [plaintiff] cannot meet its burden of proof as to any of its asserted grounds for excusable delay under the undisputed facts of this case."  Def.'s Cross-MSJ at 26.  Each basis for summary judgment on these issues and the parties' related arguments are laid out in the subsections below.[5]

### A.     Whether Plaintiff Failed to Timely Notify USACE of Delay, Precluding its Recovery

The government requests the Court deny plaintiff's excusable delay and differing site condition claims because plaintiff failed to comply with the contract's notice provisions:  FAR

---

I don't think it's that clear, Your Honor.  I think it might be mixed in with some other stuff . . . .").  Without making the arguments in its briefs, plaintiff asserts it "put in the record evidence," Tr. at 107:7, and cited a case for the arbitrary and capricious standard.  Tr. at 106:19–25; Pl.'s MSJ at 5 (citing *Darwin Constr. Co. v. United States*, 811 F.2d 593, 596 (Fed. Cir. 1987)) ("The contracting officer, however, must not make the decision to terminate for default in an arbitrary and capricious manner.").  Plaintiff has not motioned for summary judgment on this issue, nor has either party briefed it; accordingly, the Court does not decide whether the contracting officer abused her discretion here.  The Court notes, however, it reviews an agency's termination for default *de novo*.  41 U.S.C. § 7104(b)(4); *see also Seaboard Lumber Co.*, 903 F.2d at 1562.

[5] As the government notes, it is unclear from plaintiff's briefing when plaintiff is arguing excusable delay as a defense to termination for default, when plaintiff is arguing it encountered differing site conditions to obtain an equitable adjustment, and when plaintiff is simultaneously asserting both.  Def.'s Cross-MSJ at 26 n.10.  In addition, there was confusion at oral argument as to the difference between a claim for excusable delay under FAR 52.249-10(b)(2) and a claim for a differing site condition under FAR 52.236-2(a).  Tr. at 136:20–137:23 (plaintiff stating a claim for a differing site condition is in "a separate section" of the FAR; "[i]t's not in the excusable delay section."  Plaintiff continued, "we're not talking about the actual [differing site condition] claim . . . at this point.  We're talking about whether or not things happened without the fault of the contractor that excused the termination[, excusable delay].");  Tr. at 139:12–15 (plaintiff clarifying a "differing site claim . . . would be a claim for compensation for a differing site condition," separate from "an excusable delay analysis");  *but see* Pl.'s MSJ at 38–39, 41–54, 59 (tallying up the delay due to clay and debris while requesting the Court find plaintiff encountered differing site conditions).  To the extent plaintiff is arguing multiple defenses together, the Court analyzes the merits of each separately.  For clarity, the Court notes the parties' cross-motions for partial summary judgment only ask the Court to assess excusable delay for severe weather, and differing site conditions for clay and debris.  Pl.'s MSJ at 1; Def.'s Cross-MSJ at ii.  The Court's findings regarding excusable delay and differing site conditions in this Opinion are therefore limited to these three separate claims.

52.249-10 and FAR 52.236-2. Def.'s Cross-MSJ at 27–28. The government asserts plaintiff "ignores FAR 52.249-10(b)(2)'s requirement that MIC notify the contracting officer 'in writing,' 'within 10 days from the beginning of any delay'" "due to 'unforeseeable causes beyond the control and without the fault or negligence of the Contractor.'" *Id.* The government argues plaintiff failed to provide written notice of delay due to debris, differing site conditions, weather, log traffic, or clay until well after the ten days allowed by the contract for claiming excusable delay. *Id.* at 27–28. In addition, the government states FAR 52.236-2, the differing site conditions provision, required plaintiff to promptly, and before the conditions are disturbed, give written notice of such conditions. *Id.* at 28. The government asserts plaintiff "failed to provide the required 'prompt' notice before disturbing the physical conditions relating to clay and debris . . . , depriving USACE of the opportunity to 'investigate the site conditions promptly after receiving the notice.'" *Id.* at 28–29 (quoting FAR 52.236-2(b)). The government lastly argues plaintiff cannot prove "USACE was not prejudiced by [plaintiff]'s failure to provide timely notice, which 'effectively prevented any verification of [plaintiff's] claim and also the employment of alternate remedial procedures.'" *Id.* at 29 (quoting *Renda Marine, Inc. v. United States*, 66 Fed. Cl. 639, 650 (2005)).

Rather than argue compliance with the contract's notice provisions, plaintiff's briefing argues lack of notice is not a defense to its claims because the government waived the defense, the government had actual knowledge of the issues, and no prejudice resulted. Pl.'s Reply at 4–6. Plaintiff asserts USACE "waived any 10-day notice requirement by accepting MIC's claim[s] and denying the claim[s] on the merits instead of rejecting them for lack of notice." *Id.* (citing *K-Con Bldg. Sys., Inc. v. United States*, 131 Fed. Cl. 275, 321–22 (2017)). Additionally, plaintiff claims USACE had actual knowledge of the weather, debris, clay, log traffic, and sunken vessels causing plaintiff's claimed excusable delay. *Id.* at 5 (citing numerous USACE produced documents in Second Suppl. Decl. of David H. Bowser Ex. W, ECF No. 88-2). Plaintiff avers USACE cannot show any actual prejudice resulted from the lack of notice because the issues causing excusable delay would have been unchanged by prompt notice. *Id.* at 5–6. Lastly, at oral argument, plaintiff argued for the first time it provided sufficient notice. Tr. at 70:7–71:11 (citing Ex. W at 2, 9, 22, 41, 50, 51) (plaintiff's counsel responded to the Court, "I would say that it would be [satisfactory notice] . . . they make note that [plaintiff] complains of excessive debris causing frequent downtimes. The Corps mentions the change[d] conditions."); Tr. at 164:11–165:3 (citing Ex. W at 40) (plaintiff asserted it gave notice of weather on 20 November 2014).

The Court will first assess the sufficiency of plaintiff's notices regarding excusable delay and differing site conditions. The Court will then address plaintiff's lack of notice defenses: waiver and constructive notice. The Court notes, however, it finds *infra* plaintiff failed to support its unusually severe weather excusable delay claim and failed to establish its clay differing site condition claim. *Infra* Sections VI.B., VI.C.1. Notice with respect to these two claims is therefore moot because the claims fail on the merits. *See Hoel-Steffen Constr. Co. v. United States*, 456 F.2d 760, 768 (Ct. Cl. 1972) (remanding for consideration of the merits after finding the notice defense fails); *Engineered Maint. Servs., Inc.*, 55 Fed. Cl. at 641 (declining to consider the merits after finding insufficient notice). To be thorough and fully address the parties' cross-motions for summary judgment, the Court will still analyze plaintiff's notice with respect to unusually severe weather and clay.

### 1.    Whether Plaintiff's Notice Satisfies The FAR

Before showing plaintiff's delay in completing the work was excusable, plaintiff must demonstrate, "within 10 days from the beginning of any delay . . . , [it] notifie[d] the Contracting Officer in writing of the causes of delay." FAR 52.249-10(b)(2) (incorporated by reference into the parties' contract, Def.'s Cross-MSJ App. at 15). Before establishing plaintiff encountered type 1 differing site conditions, it must demonstrate that it "promptly, and before the conditions [we]re disturbed, g[a]ve a written notice to the [c]ontracting [o]fficer of (1) subsurface or latent physical conditions at the site which differ materially from those indicated in th[e] contract." FAR 52.236-2(a) (incorporated by reference into the parties' contract, Def.'s Cross-MSJ App. at 15). "No request by the [c]ontractor for an equitable adjustment to the contract under this clause shall be allowed, unless the [c]ontractor has given the written notice required." FAR 52.236-2(c).

The Court is to apply the contract's notice provisions "with a certain measure of flexibility." *K-Con Bldg. Sys., Inc.*, 131 Fed. Cl. at 321.

> To adopt [a] severe and narrow application of the notice requirements . . . would be out of tune with the language and purpose of the notice provisions, as well as with this court's wholesome concern that notice provisions in contract-adjustment clauses not be applied too technically and illiberally where the [g]overnment is quite aware of the operative facts.

*Hoel-Steffen Constr.*, 456 F.2d at 767–68 (citing *Copco Steel & Eng'g Co. v. United States*, 341 F.2d 590, 598 (Ct. Cl. 1965)); *see also Thompson v. United States*, 91 Ct. Cl. 166, 179 (1940). "[T]he notice need not be in any particular form (despite the FAR requirement of a writing) so long as it is sufficient to generally inform the [g]overnment of the facts surrounding the claim." *Engineered Maint. Servs., Inc.*, 55 Fed. Cl. at 641 (citing *Dawco Constr., Inc. v. United States*, 18 Cl. Ct. 682, 693 (1989), *aff'd in part, rev'd in part*, 930 F.2d 872 (Fed. Cir. 1991)). "Mere notice or knowledge that the contractor encountered a 'condition' falls short of the contractual requirement that the contractor notify the [g]overnment that it considered the condition to constitute a 'differing site condition.'" *Engineered Maint. Servs., Inc.*, 55 Fed. Cl. at 641–42 (citation omitted). "[O]nce [such] notice is given it need not be given again when the same conditions recur on the site." *Renda Marine, Inc.*, 66 Fed. Cl. at 650 (quoting *Dawco Constr., Inc.*, 18 Cl. Ct. at 693).

### a.    Plaintiff's Notice of Delay Due to Unusually Severe Weather

At oral argument, plaintiff provided the Court with one example of giving the government notice of weather encountered. Tr. at 164:11–165:3 (citing Ex. W at 40) (plaintiff asserting it gave notice of weather on 20 November 2014); *see also* Pl.'s Reply at 5 (listing six examples of the government's knowledge of weather conditions but providing no examples of plaintiff giving notice as to unusual severity or delay). On 19 November 2014, plaintiff encountered its first storm event. Pl.'s Suppl. Br. at 2. On 20 November 2014, plaintiff emailed the USACE contracting officer: "Due to the severe weather and wave action that is forecasted

for the rest of this week MIC will be altering its process for dredging.  [Plaintiff] was forced to shut down dredging operations of the outer channel yesterday and has moved to the inner channel . . . ."  Ex. W at 40 (plaintiff's email announcing the altered MIC schedule and forced shutdown of dredging operations due to severe weather).

While the Court is to apply the FAR 52.249-10(b)(2) notice provision with flexibility, plaintiff's alleged notice to the USACE as to unusually severe weather fails to inform the government that completion of the contract would be delayed by an unforeseeable cause.  *Id.*; *K-Con Bldg. Sys., Inc.*, 131 Fed. Cl. at 321; *see* Tr. at 165:12–14 (government counsel stating, "There's no dispute . . . [plaintiff] told the Corps, [w]eather is impacting our performance.  That doesn't mean that the weather was unforeseeable.  That doesn't mean that the weather was unusual.").  Plaintiff's notice does not indicate progress would be affected at all by the weather; rather, the email states plaintiff is adopting an alternative plan that will "allow[] dredging operations to continue despite unsafe conditions."  Ex. W at 40 (plaintiff's email announcing the altered MIC schedule).  Moreover, describing the weather encountered as severe does not necessarily mean the weather is "unusually" so, or "unforeseeable," as the contract requires.  FAR 52.249-10(b)(1).  Even assuming describing the weather as severe is sufficient notice of an "unforeseeable cause[]" of delay, *id.*, plaintiff's email goes on to explain most of its crew is taking a break from dredging for Thanksgiving anyway.  Ex. W at 40 (plaintiff's email stating "[d]redging operations will start again . . . following the holiday.").  If plaintiff intended for its email to the contracting officer to constitute notice of delay due to an unforeseeable cause, plaintiff should have said as much, rather than attributing any slow in progress to a holiday break.  *See id.*  Reviewing plaintiff's email in full, it does not notify the government that plaintiff encountered delay due to unforeseeable causes.  FAR 52.249-10(b)(1); *see Engineered Maint. Servs., Inc.*, 55 Fed. Cl. at 641–42.

Plaintiff failed to provide the Court with any other evidence it complied with the contract's notice provision regarding delay due to unusually severe weather.  *See* Pl.'s Reply at 5 (plaintiff does not argue it provided sufficient notice).  Accordingly, the Court finds no dispute of material fact that plaintiff failed to comply with the contract's notice provision, FAR 52.249-10(b)(2), for excusable delay arising from unusually severe weather.  *See Engineered Maint. Servs., Inc.*, 55 Fed. Cl. at 641–42; *Anderson*, 477 U.S. at 250; Def.'s Cross-MSJ at 27.  The Court discusses the government's waiver of the FAR 52.249-10(b)(2) notice requirements *infra* Section VI.A.2.  The Court then finds plaintiff failed to support its unusually severe weather excusable delay claim.  *Infra* Section VI.B.

### b.      Plaintiff's Notice of Debris

At oral argument, plaintiff provided the Court with six examples of communications regarding debris that allegedly satisfy the contractual notice provisions.  Tr. at 70:7–71:11 (plaintiff's counsel citing Ex. W at 2, 9, 22, 41, 50, 51 (emails and one conference call meeting minutes)).  Although plaintiff does not argue sufficient notice in its briefing, plaintiff's citations to the record regarding actual knowledge show additional USACE communications regarding man-made debris, including sunken vessels.  Pl.'s Reply at 5 (citing Ex. W at 30, 37, 44, 48, 70 (emails between plaintiff and USACE)).  The earliest of these communications occurred on 5 January 2015.  Ex. W at 44 (plaintiff's 5 January 2015 "status of dredging" email to USACE).

### i.      The Debris Timeline

Plaintiff's first encounter with debris occurred on 20 November 2014 at the Coast Guard station outside the boat basin.  *See* Pl.'s MSJ at 41 (20 November 2014 debris event indicating cables and gill nets found at Coast Guard station (citing to Ex. L at 1–4, ECF No. 81-2 (daily construction reports from 20 November 2014))).  Without considering the sufficiency of plaintiff's communications, there are 46 days between plaintiff's first claimed debris event and plaintiff's first communication to the USACE regarding the presence of debris in the waterway. *Compare* Pl.'s MSJ at 41 (20 November 2014 debris event at coast guard station) *with* Ex. W at 44 (plaintiff's 5 January 2015 "status of dredging" email to USACE).  A lapse of 46 days exceeds the ten-day notice window for excusable delay.  FAR 52.249-10(b)(2).  A lapse of 46 days is also not "prompt[], and before the conditions [we]re disturbed," as required for a differing site condition claim.  FAR 52.236-2(a); *see* Pl.'s MSJ at 41 (photo of plaintiff pulling the debris out of the water, therefore disturbing that particular condition); *Promptly*, Merriam-Webster.com Dictionary, https://www.merriam-webster.com/dictionary/promptly (last visited Feb. 9, 2022) ("without delay[,] very quickly or immediately").  Prompt notice enables the government to verify plaintiff's claims and potentially employ "alternate remedial procedures"— the government had no such opportunity with respect to the 20 November 2014 debris.  *Schnip Bldg. Co. v. United States*, 645 F.2d 950, 959 (Ct. Cl. 1981).  Accordingly, with regard only to plaintiff's excusable delay and differing site condition claims for the 20 November 2014 debris event, plaintiff failed to comply with the contractual notice provisions.  FAR 52.236-2(a), 52.249-10(b)(2).  The Court discusses the government's waiver of the notice requirements for excusable delay and differing site conditions due to debris *infra* Section VI.A.2.

Plaintiff claims 46 additional debris events occurred on or after 30 December 2014 while plaintiff was dredging in a different area—the boat basin.  *See* Pl.'s MSJ at 41–54 (claiming no delay due to debris between 20 November 2014 and 30 December 2014); Ex. W at 12 (6 January 2015 progress update reporting "lots of debris (derelict fishing nets, wire rope, tires, etc[.]) are requiring frequent shut downs to clear the dredge pump."); Tr. at 66:23–67:9 (plaintiff's counsel explaining the dredging was stopped in an effort to get started on the boat basin as soon as possible).  Given all but one of plaintiff's 47 debris claims, or 98%, occurred on 30 December 2014 or later, and at a different site (inside the boat basin), the Court applies the contract's notice provisions "with a certain measure of flexibility" and finds plaintiff's claims to excusable delay and differing site conditions due to debris are chronologically divisible.  *See K-Con Bldg. Sys., Inc.*, 131 Fed. Cl. at 321.  The singular four-hour delay due to artificial debris on 20 November 2014 likely would not alone give rise to claims for excusable delay or differing site conditions. FAR 52.236-2(a), 52.249-10(b)(2).  To start the notice clock on plaintiff's claims for excusable delay and differing site conditions on 20 November 2014 as the government argues, when 98% of debris was not encountered until 30 December 2014 or later in a separate area of the waterway, Pl.'s MSJ at 41–54, would be contrary to this court's precedent and would work an injustice on plaintiff.  *See, e.g.*, *Hoel-Steffen Constr.*, 456 F.2d at 767–68 ("To [strictly apply] the notice requirements . . . would be out of tune with the language and purpose of the notice provisions, [and] with this court's wholesome concern that notice provisions in contract-adjustment clauses not be applied too technically . . . where the [g]overnment is quite aware of the operative facts.").  Accordingly, the Court assesses notice of the boat basin debris events

separately.  To be entitled to excusable delay for the remainder of the claimed debris events, plaintiff's communications to the USACE occurring on or before 9 January 2015 must satisfy FAR 52.249-10(b)(2).  To be entitled to a differing site condition claim for the remainder of the claimed debris events, plaintiff's communications to the USACE must have occurred promptly and before the conditions were disturbed.  FAR 52.236-2(a).

Plaintiff's first debris-related communication was on 5 January 2015 and in response to a status inquiry from the USACE project manager:  "Material is pumping well when we are not hitting debris.  We are constantly pulling up items such as tires, building material, ropes and nets.  On Saturday, we had to stop 6 times to remove debris from the pump."  Ex. W at 44 (plaintiff's 5 January 2015 "status of dredging" email to USACE).  Plaintiff's email to the USACE project manager and contracting officer continued, "[plaintiff] feels a conversation needs to be had with regard to the amount of artificial debris being found in the Boat Basin.  An item here and there was anticipated but we are constantly finding material."  *Id.*; Tr. at 168:19–23 ("[USACE project manager] Mr. Pell came out [at least once per week and] looked at us dealing with the debris clog.  He snapped some pictures of piles of debris . . . .  And then they just proceeded to move forward, deal with it kind of thing."); Ex. A at 8 (deposition of USACE project manager John Pell at 56:8–57:15 (excerpts)) (stating he visited the project site at least once per week and would usually observe MIC deal with debris clogs).  On 7 January 2015, plaintiff again emailed the USACE stating, "[plaintiff] has made the USACE and the Tribe aware of the artificial debris, and other possible pollutants, that is in the marina."  Ex. W at 41.  In another 7 January 2015 email to the contracting officer, plaintiff stated:

> As per your contract officer we cannot bring in an excavator or any other means of mechanical dredging to remove the artificial debris that we were somehow, magically supposed to know was there prior to the bidding process.  The [M]ud [C]at and the [T]oyo function fine but no hydraulic dredge will remove the artificial debris that is currently in the marina.

*Id.* at 50.  On 8 January 2015, the USACE contracting officer internally sent an email regarding plaintiff stating:  "The dredge Contractor of the existing maintenance contract is failing and we . . . expect a claim from the contractor for changed conditions, part of which may be allowed."  *Id.* at 70.  Lastly, on 22 January 2015, plaintiff submitted an official claim for a differing site condition due to debris to the USACE.  *Id.* at 30–36.

### ii.    Excusable Delay

Regarding notice of excusable delay under FAR 52.249-10(b)(2), three of plaintiff's January emails discussed *supra* occurred within ten days of plaintiff beginning boat basin dredging.  Ex. W at 41, 44, 50 (5 & 7 January 2015 emails between plaintiff and USACE).  The communications informed the USACE plaintiff is experiencing significant delay due to the debris, the amount of which plaintiff did not anticipate and was ill-equipped to handle.  Ex. W at 44, 50 (explaining six stoppages in one day, the amount debris being unanticipated, and that a hydraulic dredge is insufficient).  The government understood the significance of what plaintiff was communicating as the contracting officer acknowledged the difficulty plaintiff was having and the potential claims that may come as a result.  *Id.* at 70.  Plaintiff's communications

therefore properly put the government on notice plaintiff was encountering delay due to causes it deemed unforeseeable. *Engineered Maint. Servs., Inc.*, 55 Fed. Cl. at 641–42 (citing *Dawco Constr., Inc.*, 18 Cl. Ct. at 693) ("[T]he notice need not be in any particular form (despite the FAR requirement of a writing) so long as it is sufficient to generally inform the [g]overnment of the facts surrounding the claim."). Accordingly, the Court finds no dispute of material fact that plaintiff complied with the contract's notice provision, FAR 52.249-10(b)(2), for excusable delay arising from all debris in the boat basin beginning on or after 28 December 2014. *See id.*; *Matsushita*, 475 U.S. at 587. The Court also discusses the government's waiver of the notice requirements for excusable delay due to debris *infra* Section VI.A.2.

### iii.     Differing Site Condition

Regarding notice of a differing site condition claim under FAR 52.236-2(a), within a week of its first debris events in the boat basin, plaintiff informed the government it was encountering far more debris than it anticipated or could have expected in the bidding process. Ex. W at 44, 50 (5 & 7 January 2015 emails between plaintiff and USACE). Given the amount of debris anticipated was not zero, *id.* at 44, and the contract warned of at least some debris, Def.'s Cross-MSJ App. at 273 (the 2014 contract stating, "The Contractor may encounter accumulations of forest trash, sunken logs, stumps, and miscellaneous debris."), it logically follows plaintiff would continue dredging for a few days to first determine if the debris issue was pervasive enough to constitute a differing site condition. Plaintiff's notice of debris was therefore prompt because it came shortly after it was apparent plaintiff had a differing site condition claim and still provided the government with the opportunity to inspect the condition. FAR 52.236-2(a); *Schnip Bldg. Co.*, 645 F.2d at 959; *Promptly*, Merriam-Webster.com Dictionary ("without delay[,] very quickly or immediately").

In addition, after receiving these communications from plaintiff, the contracting officer stated she was expecting a claim for a differing site condition. Ex. W at 70 (8 January 2015 email from Contracting Officer); *see also* Tr. at 168:19–23 ("[USACE project manager] Mr. Pell came out [at least once per week and] looked at us dealing with the debris clog. He snapped some pictures of piles of debris . . . . And then they just proceeded to move forward, deal with it kind of thing."); Ex. A at 8 (deposition of USACE project manager John Pell at 56:8–57:15 (excerpts)) (stating he visited the project site at least once per week and would usually observe MIC deal with debris clogs). Plaintiff's communications accordingly "notif[ied] the [g]overnment that it considered the condition to constitute a 'differing site condition,'" because the contracting officer expressly stated such. *Engineered Maint. Servs., Inc.*, 55 Fed. Cl. at 641–42; *see* Ex. W at 70 (8 January 2015 email from Contracting Officer). Plaintiff's communications were therefore sufficient to inform the government of the facts surrounding plaintiff's debris differing site condition claim. Ex. W at 41, 44, 50 (plaintiff's emails to USACE regarding debris); *see Engineered Maint. Servs., Inc.*, 55 Fed. Cl. at 641–42; *Schnip Bldg. Co.*, 645 F.2d at 959.

Further, although plaintiff's notice of debris came after plaintiff had already encountered four debris events in the boat basin, 42 more debris events, or 91% of the total debris it would encounter, remained undisturbed by the time the USACE was on notice of plaintiff's differing site condition claim. Ex. W at 41, 44, 50, 70 (emails between plaintiff and USACE); *see* Pl.'s

MSJ at 41–54 (listing debris events, including dates and locations of debris, from 11 November 2014 to 27 February 2015); Tr. at 168:8–15 ("THE COURT: [T]hat satisfied the FAR provisions including, promptly before the conditions are disturbed, give written notice to the contracting officer? [PLAINTIFF]: Yes. Because there was still plenty more . . . debris to go around out there."). Given plaintiff's delay on project completion in January 2015, and the pressure on all parties to finish dredging the boat basin before the fish window began in March 2015, it would be unreasonable to expect plaintiff to have immediately ceased operation at the first sign of any debris. Ex. W at 12 (6 January 2015 progress report), 63 (9 December 2014 email from Quileute Tribe to USACE project manager John Pell) ("It is essential to the Tribe's Treaty Rights and our fishing economy that the marina be dredged during this contract, as well as the main channel. Hopefully, these proposed weekly telephone meetings will assist in making sure that the marina is completely dredged [by] February 2015."). In addition, with 42 remaining debris events remaining, plaintiff's notice was prompt enough to afford the government the opportunity to assess plaintiff's claims or employ remedial measures. *Schnip Bldg. Co.*, 645 F.2d at 959. Applying the notice provision "with a certain measure of flexibility," *K-Con Bldg. Sys., Inc.*, 131 Fed. Cl. at 321, and considering significant debris remained for the USACE to investigate, plaintiff's notice communications occurred promptly and substantially before the debris was disturbed. FAR 52.236-2(a).

The only evidence the government presents to show plaintiff failed to provide notice of debris as a differing site condition is a 2018 deposition of MIC employee Michael Eakin stating he cannot recall any notice provided before 22 January 2015. Def.'s Cross-MSJ at 19. Considering earlier communications are in the record and discussed *supra*, Michael Eakin's memory of almost four-year-old events do not create a dispute of material fact. *Celotex*, 477 U.S at 324. The Court finds plaintiff's notice of a differing site condition arising from debris in the boat basin beginning on or after 30 December 2014, the first noticed debris event, satisfies FAR 52.236-2(a). *See Engineered Maint. Servs., Inc.*, 55 Fed. Cl. at 641–42; *Matsushita*, 475 U.S. at 587. The Court also discusses the government's waiver of the notice requirements for differing site conditions due to debris *infra* Section VI.A.2. The Court lastly discusses the merits of plaintiff's claim for a differing site condition due to debris *infra* Section VI.C.2.

### c.     Plaintiff's Notice of Clay and Log Traffic

Plaintiff does not argue it complied with either of the contract's notice provisions for clay content or floating logs in the waterway, nor does it provide the Court with any communications to the USACE on these issues. *See* Pl.'s Reply at 5 (listing six examples of the government's knowledge of these conditions but providing no examples of plaintiff giving notice as to any potential claims). The government alleges plaintiff did not claim excusable delay or differing site conditions with regard to clay or log traffic until plaintiff's counsel sent the USACE a letter in February 2015. Def.'s Cross-MSJ at 28 (not providing a copy of plaintiff's counsel's letter or an exact date of receipt).

Plaintiff's allegations regarding clay content in the waterway are limited to plaintiff's time dredging the boat basin, Pl.'s MSJ at 38–39, which began on 30 December 2014. Ex. W at 12 (6 January 2015 progress update). Plaintiff claims it encountered clay the entire time it was dredging in the boat basin. *See* Pl.'s MSJ at 37 (claiming delay for the entire period).

Accordingly, plaintiff encountered delays due to clay for at least one month before notifying the USACE in February 2015 of its claims for excusable delay and differing site conditions. Def.'s Cross-MSJ at 28; Tr. at 66:23–67:9. One month exceeds the ten days allotted for a claim to excusable delay under FAR 52.249-10(b)(2). Additionally, waiting one month to provide notice of a differing site condition while dredging continues "24/7," Ex. W at 22, cannot be considered prompt "and before the conditions [we]re disturbed" as required by FAR 52.236-2(a). Dredging 24/7 for one month before providing notice does not afford the government the opportunity to assess plaintiff's claims or employ remedial measures. *Schnip Bldg. Co.*, 645 F.2d at 959; *see infra* Section VI.A.3 (notwithstanding any finding related to the government's earlier actual or constructive notice of the claim and lack of prejudice from the lack of written notice). The Court accordingly finds no dispute of material fact that plaintiff failed to comply with the contract's notice provisions, FAR 52.236-2(a), 52.249-10(b)(2), for differing site conditions and excusable delay arising from clay. *See Engineered Maint. Servs., Inc.*, 55 Fed. Cl. at 641–42; *Matsushita*, 475 U.S. at 587. The Court discusses the government's waiver of the FAR 52.249-10(b)(2) notice requirements for excusable delay due to clay *infra* Section VI.A.2. The Court also discusses whether plaintiff may avoid the notice requirements under FAR 52.236-2(a) for its clay differing site condition claim on a theory of actual or constructive notice *infra* Section VI.A.3. The Court lastly finds plaintiff failed to establish its clay differing site condition claim *infra* Section VI.C.1.

Plaintiff's claim to excusable delay due to log traffic is directly tied to the weather events plaintiff encountered, the first of which occurred on 19 November 2014. Pl.'s Suppl. Br. at 2; Pl.'s MSJ at 70 ("The log traffic is part of the delay associated with the weather"); Tr. at 209:21–23 (plaintiff's counsel stating, "the logs are . . . what happens after you have an unusually severe weather event"). Accordingly, plaintiff waited nearly three months before notifying the USACE in February 2015 of its claims for excusable delay and differing site conditions due to log traffic. Def.'s Cross-MSJ at 28; Tr. at 66:23–67:9. Three months exceeds the ten days allotted for a claim to excusable delay under FAR 52.249-10(b)(2) and is not prompt under FAR 52.236-2(a). *Schnip Bldg. Co.*, 645 F.2d at 959. The Court finds no dispute of material fact that plaintiff failed to comply with the contract's notice provisions, FAR 52.236-2(a), 52.249-10(b)(2), for excusable delay and differing site conditions due to log traffic. *See Engineered Maint. Servs., Inc.*, 55 Fed. Cl. at 641–42; *Matsushita*, 475 U.S. at 587. The Court discusses the government's waiver of the notice requirements for excusable delay and differing site conditions due to log traffic *infra* Section VI.A.2.

## 2.      Whether the Government Waived Notice as a Defense

Plaintiff argues, through the contracting officer's decision, Ex. T, ECF No. 85-2, the government "waived any 10-day notice requirement by accepting [plaintiff]'s claim[s] and denying the claim[s] on the merits instead of rejecting them for lack of notice." Pl.'s MSJ at 4. The government broadly asserts plaintiff "is mistaken" because "the Contracting Officer (CO) did, in fact, identify [plaintiff]'s failure to provide timely notice as a basis for denying [plaintiff]'s claims," so no waiver occurred. Def.'s Reply at 12 (citing Ex. T at 15 (Contracting Officer's Decision)).

The government may waive the contract's notice requirements by failing to raise them as a defense to plaintiff's differing site conditions and excusable delay claims. *See K-Con Bldg. Sys., Inc.*, 131 Fed. Cl. at 322 (finding the contracting officer failed to reject plaintiff's claims as untimely, "effectively waiv[ing] the ten-day notice requirement"). Even where the government addresses plaintiff's differing site conditions and excusable delay claims on the merits, as long as it also raises lack of notice as a defense, no waiver results. *See N. Am. Landscaping, Constr. & Dredge Co. v. United States,* 142 Fed. Cl. 281, 291 (2019) (holding "plaintiff's weather-related excusable delay claim is time-barred," despite the contracting officer also rejecting that claim on the merits); *R.P. Wallace, Inc. v. United States*, 63 Fed. Cl. 402, 417 (2004) (same); Tr. at 171:18–25 (THE COURT: " . . . the *North American Landscaping* case states, 'Plaintiff's failure to provide proper notice as to the delays being encountered provides a second independent basis upon which to deny excusable delay.' Is that . . . not the law?" [PLAINTIFF]: "If that's what the case says, that[] would be the law.").

The contracting officer's decision summarizes plaintiff's claims as "[c]osts and delay days" for: the time elapsed between contract award and notice to proceed issuance, weather, log traffic, debris, and clay. Ex. T at 1 (Contracting Officer's Decision). The decision analyzes each of plaintiff's claims for excusable delay and differing site conditions on the merits. *Id.* at 8–18 (Part V. Analysis). The contracting officer's decision, however, denies only one of plaintiff's claims for lack of notice: differing site conditions due to clay. *Id.* at 15. The differing site condition notice provision, FAR 52.236-2, is the only notice requirement cited in denying plaintiff's claims to costs and delay days for clay content. *Id.* The decision only denies plaintiff's "request for compensation of costs associated with encountering clay-like material," and does not mention excusable delay. Ex. T at 15. The decision does not discuss the ten-day excusable delay FAR 52.249-10(b)(2) notice requirement in any capacity. *See* Ex. T. Accordingly, the Court finds no dispute of material fact that the USACE raised notice as a defense only for costs under plaintiff's clay differing site condition claim. *Id.* By failing to raise the notice provisions as a defense to the remainder of plaintiff's claims, the USACE waived the notice requirements for at least the following: (1) excusable delay related to unusually severe weather, debris, floating logs, clay, and the time elapsed between contract award and notice to proceed issuance; and (2) differing site conditions due to debris. *See K-Con Bldg. Sys., Inc.*, 131 Fed. Cl. at 322; Ex. T (Contracting Officer's Decision). The Court grants in part and denies in part the government's motion for summary judgment on the issue of notice—only plaintiff's claim for a differing site condition due to clay is barred for lack of notice. FAR 52.236-2(a); Pl.'s Reply at 4–5; Def.'s Cross-MSJ at 27–29. The Court discusses whether plaintiff may avoid the notice requirements under FAR 52.236-2(a) for its clay differing site condition claim on a theory of actual or constructive notice *infra* Section VI.A.3. The Court finds, however, plaintiff failed to establish its clay differing site condition claim *infra* Section VI.C.1.

### 3.     Whether the USACE Had Actual or Constructive Notice of Clay

Plaintiff's differing site condition claim as to clay is the only claim barred for lack of notice. *See supra* Section VI.A.2. Plaintiff argues the government had actual knowledge of the differing site conditions plaintiff encountered, and no prejudice resulted, so notice was not required. Pl.'s Reply at 5; Tr. at 136:1–8 (plaintiff arguing *K-Con Bldg. Sys., Inc.*, 131 Fed. Cl. 275, and *Hoel-Steffen Const. Co.*, 456 F.2d 760, support its actual knowledge theory). Plaintiff

argues the government failed to identify any actual prejudice because notice would not have removed the clay content and the government was already aware of the clay's presence. Pl.'s Reply at 5. The government argues it was "prejudiced by its inability to obtain sampling of the boat basin material in order to conclusively establish whether the clay content was of a type that could reasonably be expected to interfere with competent dredging activity." Def.'s Reply at 13. The government asserts the lack of notice "effectively prevented any verification of [plaintiff's] claim and also the employment of alternate remedial procedures." *Id.* (quoting *Renda Marine, Inc.*, 66 Fed. Cl. at 650).

Plaintiff may avoid the differing site condition notice requirements by "proceeding on a theory that the government had actual or constructive notice." *Renda Marine, Inc.*, 66 Fed. Cl. at 650. Once plaintiff shows the government had actual or constructive notice of a differing site condition, plaintiff must prove the government was not prejudiced by the lack of written or oral notice from the plaintiff. *Id.* "The government may defeat recovery by proving that 'it was prejudiced or disadvantaged by plaintiff's failure to give notice' . . . and may satisfy this burden by establishing that 'the passage of time obscured the elements of proof or [that] defendant could have minimized the extra work and attendant costs had notice been given.'" *Id.* (quoting *Dawco Constr., Inc.*, 18 Cl. Ct. at 693); *see also Schnip Bldg. Co.*, 645 F.2d at 959 ("[P]laintiff's[] failure to render the notice . . . and its completion of the [contract work before] submitting its claim prevented the [g]overnment from ascertaining whether the . . . problems resulted from a subsurface condition that was unexpected or from [plaintiff's own] use of an improper . . . procedure . . . . The lack of a timely notice was prejudicial to the [g]overnment because it effectively prevented any verification of [plaintiff's] claim and also the employment of alternate remedial procedures." (internal citations omitted)); *K-Con Bldg. Sys., Inc.*, 131 Fed. Cl. at 321 (quoting *Hoel-Steffen Constr. Co.*, 456 F.2d at 767–68 ("[N]otice provisions in contract-adjustment clauses [should] not be applied too technically and illiberally where the [g]overnment is quite aware of the operative facts.")).

Plaintiff provides three examples of the government's actual notice of plaintiff's delays due to clay content in the boat basin. Pl.'s Reply at 5 (citing Ex. W at 24, 26, 56 (emails between plaintiff and USACE)). The government does not dispute its knowledge of the delays due to clay content in the boat basin. Def.'s Reply at 12. The USACE project manager stated in deposition testimony he personally observed consolidated cohesive soils in the boat basin. Pl.'s MSJ at 33–34. The project manager stated he knew the boat basin materials contained 7%–10% clay when preparing the 2014 solicitation. *Id.* at 32. The solicitation referenced documentation containing information about the clay content of the boat basin. Def.'s Cross-MSJ at 36. The government's notice as to clay content in the boat basin causing plaintiff delay is accordingly not in dispute. Ex. W at 24, 26, 56 (emails between plaintiff and USACE); Def.'s Reply at 12 (admitting the government knew "MIC was experiencing . . . difficulty dredging the boat basin material . . . ."). The government does dispute, however, whether its knowledge of plaintiff's delays due to the clay content constitutes notice that plaintiff "viewed those circumstances as" rising to the level of "unforeseeable or as differing site conditions" under the FAR. Def.'s Reply at 12. There are accordingly disputes of material fact as to whether the government had actual or constructive notice of plaintiff's clay differing site condition claim. *Anderson*, 477 U.S. at 250; *see Renda Marine, Inc.*, 66 Fed. Cl. at 650 (citations omitted) ("[A] plaintiff-contractor bears the

burden of proving that the contracting officer was timely informed of the alleged differing site condition.").

Regarding prejudice, both parties offer legal conclusions as to whether the government was prejudiced by the lack of notice, but neither party identifies facts sufficient to support their conclusions. *See* Pl.'s Reply at 5; Def.'s Reply at 13. Plaintiff's assertion "[p]rompt notice does not make the clay go away," Pl.'s Reply at 5, is irrelevant to whether notice might have provided the government the opportunity to "minimize[] the extra work and attendant costs had notice been given." *Dawco Constr., Inc.*, 18 Cl. Ct. at 693. Similarly, the government's assertion it was "prejudiced by its inability to obtain sampling of the boat basin material," Def.'s Reply at 13, is unsupported by any facts that might show how "the passage of time obscured the elements of proof" for plaintiff's differing site condition claim. *Dawco Constr., Inc.*, 18 Cl. Ct. at 693. There are accordingly disputes of material fact as to the prejudice faced by the government resulting from the lack of notice of plaintiff's clay differing site condition claim. *Anderson*, 477 U.S. at 250.

The Court declines to enter summary judgment on whether plaintiff may avoid the notice requirements under FAR 52.236-2(a) for its clay differing site condition claim on a theory of actual or constructive notice. *Renda Marine, Inc.*, 66 Fed. Cl. at 650. The Court finds there are disputes of material fact regarding whether the government had actual or constructive notice of plaintiff's clay differing site condition claim by virtue of its knowledge of plaintiff's delays due to clay content. *Id.* The Court also finds there are disputes of material fact regarding whether "the passage of time obscured the elements of proof or how defendant could have minimized the extra work and attendant costs had notice been given." *Dawco Constr., Inc.*, 18 Cl. Ct. at 693; *see also Schnip Bldg. Co.*, 645 F.2d at 959–60. The Court lastly finds plaintiff failed to establish its clay differing site condition claim *infra* Section VI.C.1. Accordingly, although the Court declines to enter summary judgment on plaintiff's actual or constructive notice theory, those issues are moot in view of plaintiff's failure to establish the merits of its clay differing site condition claim. *See Hoel-Steffen Constr. Co.*, 456 F.2d at 768 (remanding for consideration of the merits after finding the notice defense fails); *Engineered Maint. Servs., Inc.*, 55 Fed. Cl. at 641 (declining to consider the merits after finding insufficient notice).

### B.   Plaintiff's Claim to Excusable Delay for Unusually Severe Weather

Plaintiff argues it suffered unusual, excessive, and repetitive storm events that impacted its ability to dredge, causing at least 30 days of delay. Pl.'s MSJ at 17. Plaintiff claims "[t]his amounts to a loss of 20% of the available dredging days," constituting an unforeseeable cause of excusable delay. *Id.* at 17–18 (citing the notice to proceed of 24 September 2014 and the work window close date at the end of February 2015). Plaintiff argues the bad weather began before the submittal process was expected to conclude and continued into the contract period. Pl.'s Reply at 6 (citing Ex. W at 46 (email from the contracting officer)). Plaintiff states the weather delays were unexpected, even if plaintiff built "19 days of float" into its schedule for the contract. *Id.* at 7. Under FAR 52.249-10(b)(1), plaintiff asserts "the government cannot assess damages against a contractor for a failure to timely complete work under a contract if '[t]he delay in completing the work arises from unforeseeable causes.'" Pl.'s MSJ at 17–18. Plaintiff

states it is therefore entitled to summary judgment on the government's counterclaims because they are based on a termination for default that is wrongful due to excusable delay. *Id.* at 18.

The government in turn argues the weather was not so unusually severe as to be unforeseeable. Def.'s Reply at 13–14. The government asserts plaintiff faced "the type of severe weather that is customary at La Push during winter, and that [plaintiff] should have planned and prepared for." *Id.* at 15 (citing Def.'s Cross-MSJ App. at 458 (plaintiff's transmitted schedule explaining it has 46 days to be flexible for weather)). Even if the weather was unusually severe, the government argues the weather delay was not "beyond the control and without the fault or negligence" of plaintiff, because plaintiff was late in providing requisite submittals, pushing the dredging into the winter. Def.'s Cross-MSJ at 31–32 (citing Second Am. Compl. at 4). The government also asserts much of the delay resulted from pre-existing equipment problems which plaintiff has yet to demonstrate as independent of the weather delays. *Id.* at 32 (citing Def.'s Cross-MSJ App. at 485–86 (internal MIC email), 334, 341 (deposition of MIC employee Michael Harrison)). Lastly, the government argues plaintiff's inclusion of "'19 working days for weather,' plus '27 days from holiday weeks and Sundays' allocated to anticipated 'weather and/or production issues,'" demonstrates the 30-day weather delay experienced was not unforeseeable, even to plaintiff. *Id.* at 32; Def.'s Reply at 15. The government thus asserts plaintiff's excusable delay due to severe weather claim must fail. Def.'s Reply at 15.

Plaintiff's failure to timely perform a contract is excusable if it "arises from unforeseeable causes beyond the control and without the fault or negligence of the [c]ontractor." FAR 52.249-10(b)(1) (listing unusually severe weather as an exemplary unforeseeable cause of excusable delay); *see* Def.'s Cross-MSJ App. at 15 (incorporating FAR 52.249-10(b)(1) by reference into the parties' contract). In determining whether a contractor is entitled to weather-related excusable delay, the contractor must provide evidence of unusually severe weather conditions. *Broome Constr., Inc. v. United States*, 492 F.2d 829, 835 (Ct. Cl. 1974). "Unusually severe weather must be construed to mean adverse weather which at the time of year in which it occurred is unusual for the place in which it occurred." *Id.* Unusually severe weather is determined based on a comparison of the conditions experienced by the contractor and the weather conditions of prior years. *Cape Ann Granite Co. v. United States*, 100 Ct. Cl. 53, 71–72 (1943).

On 29 December 2020, the Court found inadmissible substantially all of plaintiff's evidence related to the severity of the weather it encountered.[6] *See* Order at 26, ECF No. 100 (holding inadmissible Decl. of Joseph Bernert in Supp. of Pl.'s Mots. for Summ. J. ¶¶ 4E, 5–12, ECF No. 81, and all declaration statements taken from Ex. H, Interrogatory No. 9, ECF No. 81-1,

---

[6] The Court does not consider the excluded portions of plaintiff's evidence in its analysis. Even if the Court were to consider plaintiff's excluded evidence of unusual severity, the Court notes plaintiff's evidence demonstrates the weather it encountered is only the third most severe season out of the seven preceding seasons. Pl.'s MSJ at 12 (citing Ex. H at 33 (plaintiff's interrogatory response)). Further, the contracting officer's decision analyzed plaintiff's unusually severe weather claim and found the weather plaintiff experienced was "only marginally above the 14-year average, and still well within the range that a reasonable contractor with the information publically [sic] available and provided through the contract specifications and the bid preparation process should have anticipated." Ex. T at 13 (Contracting Officer's Decision). The weather plaintiff encountered was therefore likely not unusually severe. *Broome Constr., Inc.*, 492 F.2d at 835.

and any other statements in Ex. H containing analysis of weather patterns); Pl.'s MSJ at 7–16.  In its supplemental brief, plaintiff maintained the weather was unusually severe because the USACE contracting officer "believed" plaintiff when it told her "the weather was unusually bad."  Pl.'s Suppl. Br. at 2 (citing Bowser Decl. Ex. C at 3, ECF No. 80-3).  At oral argument, when asked for evidence of unusual severity, plaintiff could only cite to an email from the Quileute Tribe, stating:  "La Push is in the midst of its second major storm of the season, and it is not even mid-December.  At this rate, and based on the normal weather patterns that the Tribe's elders and fishers affirm, we can expect a minimum of 8–9 of these major storms this season." Ex. W at 63.

Plaintiff's supplemental brief offers no comparison of the weather encountered to the weather conditions of prior years.  Pl.'s Suppl. Br. at 2–3; *Cape Ann Granite Co.*, 100 Ct. Cl. at 71–72.  Members of the Quileute Tribe opining on the number of storms they anticipated is insufficient to demonstrate plaintiff encountered "adverse weather which at the time of year in which it occurred is unusual for the place in which it occurred."  *Broome Constr., Inc.*, 492 F.2d at 835; Ex. W at 63 (email from the Quileute Tribe); *Cape Ann Granite Co.*, 100 Ct. Cl. at 71–72; *see* Tr. at 185:11–187:3 (government counsel responding to plaintiff's citation to the Quileute Tribe email by arguing "a tribal member speculating about the number of storms that will be upcoming based on the number of storms that have occurred says nothing to suggest that this is unusually severe let alone unforeseeably so").  Members of the Quileute Tribe are no doubt familiar with the climate in which they live, but that alone does not qualify them as experts in the field of meteorology, nor does it transform their emails on weather into expert reports.  *See* Fed. R. Evid. 702.  In addition, the Court notes weather is generally worse in the winter season, and plaintiff did not begin dredging the waterway until 18 November 2014.  Tr. at 116:3–7 (government counsel indicating work conditions in the fall are better than winter), 63:18–25.  Accordingly, the Court finds "there is an absence of evidence to support" plaintiff's claims of unusually severe weather.  *Dairyland Power Co-op. v. United States*, 16 F.3d 1197, 1202 (Fed. Cir. 1994) (citing *Celotex*, 477 U.S. at 325); *Broome Constr.*, 492 F.2d at 835; *Matsushita*, 475 U.S. at 587.  The Court grants the government's motion for summary judgment and denies plaintiff's motion for summary judgment on plaintiff's claim for excusable delay due to unusually severe weather.  Def.'s Cross-MSJ at 29–31; Pl.'s MSJ at 18.

### C.    Plaintiff's Differing Site Condition Claims

Plaintiff moves for summary judgment on two claims for type 1 differing site conditions: clay and debris.[7]  Pl.'s MSJ at 1.  To prevail on a differing site condition claim, plaintiff must prove four elements.  *Int'l Tech. Corp. v. Winter*, 523 F.3d 1341, 1348–49 (Fed. Cir. 2008). First, plaintiff must prove "a reasonable contractor reading the contract documents as a whole would interpret them as making a representation as to the site conditions."  *Id.* at 1348 (citing *Renda Marine, Inc. v. United States*, 509 F.3d 1372, 1376 (Fed. Cir. 2007)).  Whether the contract makes a representation as to the disputed site conditions is a matter of contract

---

[7] "Type 1" differing site conditions refer to "subsurface or latent physical conditions at the site which differ materially from those indicated in this contract."  FAR 52.236-2(a)(1).  "Type 2" differing site conditions refer to "unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in the contract."  FAR 52.236-2(a)(2).

interpretation and a question of law. *Id.* at 1349; *Stuyvesant Dredging Co. v. United States*, 11 Cl. Ct. 853, 858 (1987), *aff'd*, 834 F.2d 1576 (Fed. Cir. 1987). The contractual representation must be affirmative. *See Comtrol, Inc. v. United States*, 294 F.3d 1357, 1363 (Fed. Cir. 2002) (denying a type 1 differing site condition claim where "the specification did not affirmatively represent that only hard material would be encountered"); *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1347 (Fed. Cir. 1998) (denying a type 1 differing site condition claim where "a reasonable and prudent contractor would not have understood the contract documents as providing an affirmative indication of the subsurface conditions"). "A contractor cannot be eligible for an equitable adjustment for a Type I differing site condition unless the contract indicated what that condition would be." *H.B. Mac, Inc.*, 153 F.3d at 1345 (citing *P.J. Maffei Bldg. Wrecking Corp. v. United States*, 732 F.2d 913, 916 (Fed. Cir. 1984)). "[A] proper technique of contract interpretation is for the court to place itself into the shoes of a reasonable and prudent contractor and decide how such a contractor would act in interpreting the contract documents." *Id.*

"Second, [plaintiff] must prove . . . the actual site conditions were not reasonably foreseeable to the contractor, with the information available to the particular contractor outside the contract documents, *i.e.*, that the contractor 'reasonably relied' on the representations." *Int'l Tech. Corp.*, 523 F.3d at 1349 (quoting *Renda Marine, Inc.*, 509 F.3d at 1376). "In other words, . . . it must be 'reasonably unforeseeable on the basis of all the information available to the contractor at the time of bidding.'" *Sergent Mech. Sys., Inc. v. United States*, 34 Fed. Cl. 505, 518 (1995) (quoting *Mojave Enters. v. United States*, 3 Cl. Ct. 353, 356–57 (1983)). "[C]onditions which are discoverable by a reasonable site visit and review of the contract documents [are] chargeable to the contractor." *Id.* (citations omitted).

"Third, [plaintiff] must prove . . . [it] in fact relied on the contract representation." *Int'l Tech. Corp.*, 523 F.3d at 1349; *see Fehlhaber Corp. v. United States*, 151 F. Supp. 817, 825 (Ct. Cl. 1957) (holding it "would have a virtual impossibility" for plaintiff to discover the condition on its own, so "[p]laintiff had a right to rely on the [g]overnment's specifications and drawings"); *Foster Constr. C. A. & Williams Bros. Co. v. United States*, 435 F.2d 873, 889 (Ct. Cl. 1970) ("Without notice of the alluvial condition or reason to doubt the logs, plaintiff and the other bidders had every reason and right to rely on the clear indications in the logs of the nature of the subsurface.").

"Fourth, [plaintiff] must prove . . . the conditions differed materially from those represented and [it] suffered damages as a result." *Int'l Tech. Corp.*, 523 F.3d at 1349. Relying on a "total time theory" to prove excusable delay is impermissible because it assumes the government is responsible for all the claimed delay. *Catel, Inc. v. United States*, No. 05-1113 C, 2012 WL 3104366, at *34 (Fed. Cl. July 30, 2012) (quoting *Morganti Nat., Inc. v. United States*, 49 Fed. Cl. 110, 134 (2001), *aff'd*, 36 F. App'x 452 (Fed. Cir. 2002)).

Under the "total time theory," a contractor asserts that wrongful government action contributed to delayed contract completion and "simply takes the original and extended completion dates, computes therefrom the intervening time or overrun, points to a host of individual delay incidents for which defendant was allegedly

responsible and which 'contributed' to the overall extended time, and then leaps to the conclusion that the entire overrun time was attributable to defendant."

*Id.* (quoting *Law v. United States,* 195 Ct. Cl. 370, 382 (1971)).  "It is well settled that this 'total time' theory of proving delay is insufficient to meet the contractor's burden to prove that government-caused delay actually delayed the overall completion of the project." *Fireman's Fund Ins. Co. v. United States*, 92 Fed. Cl. 598, 669 n.88 (2010) (citations omitted).

### 1.    Whether the Clay Plaintiff Encountered was a Differing Site Condition

Regarding the first element of plaintiff's clay differing site condition claim, whether a reasonable contractor reading the contract documents as a whole would interpret them as making an affirmative representation, plaintiff argues the USACE made a positive representation, based upon its own testing, the materials to be removed were composed of cobbles to fine silts, not clay.  Pl.'s MSJ at 38.  Plaintiff asserts the USACE's own website draws a distinction between silt and clay, so it was reasonable for plaintiff to draw that same distinction.  *Id.* at 31 (citing *Dredging Operations*, USACE, https://www.sam.usace.army.mil/Missions/Civil-Works/Navigation/Dredging-Operations/) ("Maintenance dredging operations involve the repetitive removal of naturally recurring deposited bottom sediment such as sand, silt, and clays in an existing navigation channel.") (last visited Feb. 15, 2022).  The government responds the "cobbles to fine silts" representation did not exclude any amount of clay.  Def.'s Cross-MSJ at 34.  Moreover, the government points out the solicitation referred to a water quality certification which directed readers to a public document containing the sediment composition.  *Id.* at 36.  Had plaintiff "carefully review[ed] the solicitation," the government argues, plaintiff would not have been "surprised" at the lack of sediment information.  *Id.*

The solicitation stated the material to be dredged "is composed of cobbles to fine silts," without mentioning clay.  Def.'s Cross-MSJ App. at 273 (2014 solicitation); *Weeks Dredging & Contracting, Inc. v. United States*, 13 Cl. Ct. 193, 219 (1987) ("Where the contract contains no affirmative (positive or negative) representations of the subsurface conditions, purportedly relied on by the contractor, the government has no liability."), *aff'd*, 861 F.2d 728 (Fed. Cir. 1988).  Additionally, the solicitation included a water quality certification with which plaintiff was required to comply.  Def.'s Cross-MSJ App. at 258, 263 (2014 solicitation).  The certification disclosed to all bidders that "[s]ediment sampling in the navigation channel and boat basin occurred . . . on October 5, 2010; with results documented in a Suitability Determination (SD) dated January 6, 2011."  *Id.* at 263 (2014 solicitation).  The publicly available suitability determination unambiguously stated the boat basin sediment was comprised of "less than 1% gravel, 22% sand, 71% silt, and 7% clay."  Pl.'s MSJ at 32.  Viewing "the contract documents as a whole," the government did not affirmatively represent plaintiff would not encounter clay in the solicitation.  *Int'l Tech. Corp.*, 523 F.3d at 1348; *Comtrol*, 294 F.3d at 1363; *H.B. Mac, Inc.*, 153 F.3d at 1347.  To the contrary, by referencing the suitability determination, "the contract indicated" plaintiff could expect to encounter exactly 7% clay content.  *H.B. Mac, Inc.*, 153 F.3d at 1345.  "A contractor has a duty to review information referred to and made available for inspection in the contract documents." *Delhur Indus., Inc. v. United States*, 95 Fed. Cl. 446, 457 (2010) (citing *Randa/Madison Joint Venture III v. Dahlberg*, 239 F.3d 1264, 1270–72 (Fed. Cir.

2001); *Neal & Co. v. United States*, 36 Fed. Cl. 600, 617 (1996) (holding that in determining if a contractor's bid is reasonable, the court "must assess all of the information that was available to the bidders at the time of bidding"), *aff'd*, 121 F.3d 683 (Fed. Cir. 1997)). Plaintiff's failure to review the suitability determination does not mean the government misrepresented the clay content in the waterway. *Id.*; Pl.'s Reply at 15; Def.'s Cross-MSJ App. at 362 (deposition of MIC co-owner Joseph Bernert at 38:2–18 (excerpts)) (indicating plaintiff did not review the suitability determination containing the sediment contents). The USACE's website—unreferenced by the contract—listing silt and clays separately has no bearing on the fact 7% clay content was explicitly disclosed. Pl.'s MSJ at 31–32. Accordingly, "a reasonable contractor reading the contract documents as a whole would interpret them as" representing the material to be dredged was composed of cobbles to fine silts, and—through the water quality certification—7% clay. *Int'l Tech. Corp.*, 523 F.3d at 1348; *H.B. Mac, Inc.*, 153 F.3d at 1345; *Delhur Indus., Inc.*, 95 Fed. Cl. at 457. Plaintiff fails to establish the first element of its clay differing site condition claim. *Int'l Tech. Corp.*, 523 F.3d at 1348; *Comtrol*, 294 F.3d at 1363; *H.B. Mac, Inc.*, 153 F.3d at 1347.

For the second element—whether the conditions were reasonably foreseeable—plaintiff argues it would be unreasonable to expect a bidder to go beyond the water quality certification referenced by the solicitation to uncover sediment sampling results which indicate the presence of clay. Pl.'s Reply at 15. The government responds by arguing plaintiff's "unsubstantiated assertions" are not evidence of what a reasonable contractor would do, and plaintiff should have reviewed the solicitation more carefully. Def.'s Reply at 17 (quoting *Jones v. Dep't of Health & Hum. Servs.*, 834 F.3d 1361, 1369 (Fed. Cir. 2016)). Even without the water quality certification, the government asserts fine silts includes clay under the ASTM version of the Unified Soil Classification System, so the solicitation did not represent no clay would be present. Def.'s Cross-MSJ at 34; Def.'s Cross-MSJ App. at 522–23 (9 October 2014 USACE email to MIC estimator regarding ASTM Standard). The government states the contracting officer even provided plaintiff, at its request, with the applicable ASTM standard before plaintiff provided any submittals. *Id.* at 35.

Even if the government affirmatively represented no clay was present, the presence of clay would have been "reasonably foreseeable to [plaintiff] with the information available to [it] outside the contract documents." *Int'l Tech. Corp.*, 523 F.3d at 1349. First, the suitability determination is a public document referenced by the solicitation and described as containing the results of "sediment sampling in the navigation channel and boat basin." Def.'s Cross-MSJ App. at 263 (2014 solicitation). "[O]n the basis of all the information available to [plaintiff] at the time of bidding," the presence of clay was therefore reasonably foreseeable. *Sergent Mech. Sys.*, 34 Fed. Cl. at 518 (quoting *Mojave Enters.*, 3 Cl. Ct. at 356–57). Second, if plaintiff perhaps missed the suitability determination during its "half hour" review of the 150-page solicitation and "was surprised" about the "limited information about sediments," the burden was on plaintiff to make the "relatively simple inquir[y]" to the government which would have revealed the information plaintiff sought. Def.'s Cross-MSJ App. at 362, 364–65 (deposition of MIC co-owner Joseph Bernert at 38:2–18, 40:24–41:3 (excerpts)); *Foster Constr. C.A.*, 435 F.2d at 888 ("The contractor is unable to rely on contract indications of the subsurface only where relatively simple inquiries might have revealed contrary conditions."). Instead, plaintiff rested on a thirty-minute review of the 150-page solicitation and looked no further for sediment information.

*Foster Constr. C.A.*, 435 F.2d at 888.  Plaintiff's assumption about the sediment contents, when plaintiff failed to review the suitability determination or inquire for further information, "is more akin to a miscalculation." *Weeks Dredging & Contracting, Inc.*, 13 Cl. Ct. at 219.  The clay content was "discoverable by . . . review of the contract documents [and is thus] chargeable to the contractor." *Sergent Mech. Sys.*, 34 Fed. Cl. at 518.  Accordingly, plaintiff fails to establish the second element of its clay differing site condition claim.  *Int'l Tech. Corp.*, 523 F.3d at 1349; *Renda Marine, Inc.*, 509 F.3d at 1376.

Regarding the third element, whether plaintiff relied on the contract's representations, plaintiff does not expressly state it relied on the representations contained in the solicitation and contract, but the argument can be inferred from plaintiff's briefs.  *See* Pl.'s MSJ at 38–39 ("USACE made a representation that silt was the smallest particle to be dredged.  They were incorrect.  [Plaintiff] encountered clay . . . .  Clay is harder to dredge.  Because [plaintiff] encountered clay and clay was not listed as a material to be dredged, [plaintiff] encountered a differing site condition . . . .").  The government does not argue plaintiff cannot meet its burden of proof as to the third element.  Def.'s Cross-MSJ at 34 ("Here, the undisputed evidence demonstrates that [plaintiff] cannot meet its burden of proof as to the first, second, or fourth elements necessary for sustaining a differing site condition claim with regard to any of [plaintiff]'s alleged differing site conditions.").

Plaintiff cites several cases where contractors relied on vibracore logs to understand the sediment contents of the sites at issue, unlike plaintiff in this case.  *Compare* Pl.'s MSJ at 27–28 (citing *Foster*, 435 F.2d at 888–89 (contractor entitled to rely on subsurface condition logs); *Farnsworth & Chambers Co. v. United States*, 346 F.2d 577, 580 (Ct. Cl. 1965) (contractor entitled to rely on the government's representations in "drawings, specifications and borings"); *Vann v. United States*, 420 F.2d 968, 975–76 (Ct. Cl. 1970) (contractor misled by contract drawings)), *with* Pl.'s MSJ at 31 ("The contract described the 'material to be removed' as:  . . . cobbles to fine silts."), *and* Def.'s Cross-MSJ App. at 364–65 (deposition of MIC co-owner Joseph Bernert at 40:24–41:3 (excerpts)) ("I was surprised there was no vibracores.  There was very limited information about the sediments.").  The government did not provide bidders with vibracore logs in this case, so plaintiff "was surprised" about the "limited information about sediments" after spending a "half hour" reviewing the 150-page solicitation.  Def.'s Cross-MSJ App. at 362, 364–65, (deposition of MIC co-owner Joseph Bernert at 38:2–18, 40:24–41:3 (excerpts)).  Rather than review the contract further and discover the referenced suitability determination which contained the sediment sampling results, or make the "relatively simple inquir[y]" to the government for details of the sediment contents, plaintiff instead relied on its own assumptions.  *Foster Constr. C.A.*, 435 F.2d at 888 (holding a "contractor is unable to rely on contract indications of the subsurface only where relatively simple inquiries might have revealed contrary conditions"); Def.'s Cross-MSJ App. at 362 (deposition of MIC co-owner Joseph Bernert at 38:2–18 (excerpts)) (indicating plaintiff did not review the suitability determination containing the sediment contents).  "Plaintiff had a right to rely on the [g]overnment's specifications"—plaintiff, however, did not rely on the provided specifications here.  *Fehlhaber Corp.*, 151 F. Supp. at 825.  "Reasonable reliance cannot exist where the contractor bid without having reviewed the contract documents on which it seeks to rely." *Comtrol*, 294 F.3d at 1364; Def.'s Cross-MSJ App. at 362 (deposition of MIC co-owner Joseph Bernert at 38:2–18 (excerpts)).  The Court finds plaintiff did not "in fact rel[y] on the contract

representation," so plaintiff fails to establish the third element of its clay differing site condition claim. *Int'l Tech. Corp.*, 523 F.3d at 1349; *Comtrol*, 294 F.3d at 1364; *Delhur Indus., Inc.*, 95 Fed. Cl. at 457 (citing *Randa/Madison Joint Venture III*, 239 F.3d at 1270–72) ("A contractor has a duty to review information referred to and made available for inspection in the contract documents.").

For the fourth element, whether the conditions differed from the representation and plaintiff suffered damages as result, plaintiff argues because clay is more difficult to dredge, its production rate was significantly lower than typical. Pl.'s MSJ at 37–38. Plaintiff takes its typical dredge rate, compares it to the amount plaintiff actually dredged, and attributes the difference to clay. *Id.* The government argues plaintiff "cannot prove 'the extent to which completion of the contract work as a whole was delayed'" by the clay content, so its excusable delay claim must fail. Def.'s Reply at 18–19 (citing *Int'l Tech. Corp.*, 523 F.3d at 1349; *Morganti Nat.*, 49 Fed. Cl. at 132). The government states plaintiff provided no admissible evidence to support its typical dredge rate assertion or to prove the 7% clay content is solely attributable for the delay claimed. *Id.* at 19.

At the outset, the conditions plaintiff encountered did not differ from those represented because the government unequivocally disclosed the presence of clay content in the boat basin. Pl.'s MSJ at 32; *Int'l Tech. Corp.*, 523 F.3d at 1348; *Comtrol*, 294 F.3d at 1363; *H.B. Mac, Inc.*, 153 F.3d at 1347. Addressing plaintiff's claim for damages regardless, plaintiff merely shows it progressed slowly while dredging the boat basin and then leaps to the conclusion this was "caused by . . . stiff clay." Pl.'s Reply at 16–17. Plaintiff "takes the original . . . completion date[], computes therefrom the . . . overrun, points to [stiff clay] for which defendant was allegedly responsible and which 'contributed' to the overall extended time, and then leaps to the conclusion that the entire overrun time was attributable to defendant." *Law*, 195 Ct. Cl. at 382. Plaintiff's use of a "total time theory" to prove delay is impermissible for showing the damages required by the fourth element of a differing site condition claim because it assumes the government is responsible for all of the claimed delay. *Catel, Inc.*, 2012 WL 3104366, at *34 (quoting *Morganti Nat.*, 49 Fed. Cl. at 134); *Int'l Tech. Corp.*, 523 F.3d at 1349. "It is well settled that this 'total time' theory of proving delay is insufficient to meet [plaintiff]'s burden" to show what damages it suffered. *Fireman's Fund Ins.*, 92 Fed. Cl. at 669 n.88 (citation omitted). Accordingly, plaintiff fails to establish the fourth element of its clay differing site condition claim. *Id.*; *Catel, Inc. v. United States*, 2012 WL 3104366, at *34; *Int'l Tech. Corp.*, 523 F.3d at 1349.

The Court finds no dispute of material fact that plaintiff failed to establish it encountered a differing site condition due to clay. *Int'l Tech. Corp.*, 523 F.3d at 1348–49; *Comtrol*, 294 F.3d at 1363–64; *H.B. Mac, Inc.*, 153 F.3d at 1347; *Renda Marine, Inc.*, 509 F.3d at 1376; *Matsushita*, 475 U.S. at 587. The Court accordingly grants the government's motion for summary judgment and denies plaintiff's motion for summary judgment on plaintiff's claim to a differing site condition due to clay. Def.'s Cross-MSJ at 34–39; Pl.'s MSJ at 38–39. For this reason, whether the government had actual or constructive notice of this claim is moot. *See supra* Section VI.A.3.

### 2.    Whether the Debris Plaintiff Encountered was a Differing Site Condition

Like clay, plaintiff asserts the debris it encountered in the boat basin constituted a type 1 differing site condition. Pl.'s MSJ at 59. Plaintiff alleges the USACE knew "the basin was a garbage dump," yet represented to plaintiff the job was mere "routine maintenance dredging." *Id.* Plaintiff states the debris caused substantial downtime, *id.*, and no pre-bid site visit would have revealed what plaintiff discovered beneath the water. Pl.'s Reply at 20. The solicitation stated plaintiff "may encounter" debris and the government had no knowledge of artificial obstructions; plaintiff argues this implies any impediments would be few and limited to only natural materials. Pl.'s MSJ at 58. Plaintiff lastly argues for the rule of *ejusdem generis* to limit the warning of "miscellaneous debris" to only natural forest debris.[8] Pl.'s Reply at 19.

The government responds plaintiff's arguments are based on assumptions, attributable only to contractor error. Def.'s Cross-MSJ at 39. According to the government, "[t]he solicitation's use of the word 'may' did not constitute an 'affirmative' representation that any 'miscellaneous debris' a contractor might encounter would be limited to a particular amount." *Id.* If plaintiff had conducted a pre-bid site visit as required, the government argues, plaintiff would have discovered the nature and quantity of debris it would soon encounter. *Id.* at 40. Lastly, the government disagrees with plaintiff's application of the rule of *ejusdem generis*. Def.'s Reply at 20.

Regarding the first element of plaintiff's debris differing site condition claim, whether a reasonable and prudent contractor reading the contract documents as a whole would interpret them as making an affirmative representation, the contract stated plaintiff "may encounter accumulations of forest trash, sunken logs, stumps, and miscellaneous debris." Def.'s Cross-MSJ App. at 123 (contract). The contract also stated "the [g]overnment has no knowledge of cables, pipes, or other artificial obstructions or of any wrecks, wreckage, or other material that would necessitate the employment of additional equipment for economical removal." *Id.*

While the parties suggest what a reasonable interpretation of these contract provisions might be, neither party addresses how the Court is to determine how "a reasonable and prudent contractor . . . would act in interpreting the contract documents." *H.B. Mac, Inc.*, 153 F.3d at 1345. Plaintiff argues the use of the word "may" indicates a lower probability and "miscellaneous debris" is limited to natural debris, Pl.'s MSJ at 58—and that may indeed be how plaintiff interpreted the contract—but that says little of how "a reasonable and prudent contractor" would interpret the clauses. *H.B. Mac, Inc.*, 153 F.3d at 1345. The government describes plaintiff's interpretations as "unreasonable assumption[s]," "implausible," and "contractor error," Def.'s Cross-MSJ at 39–40; however, the government presents no evidence to show "a reasonable and prudent contractor" would have interpreted the contract differently. *H.B. Mac, Inc.*, 153 F.3d at 1345. The parties further dispute which interpretation tools the Court should use to understand the contract—plaintiff argues for *ejusdem generis*, the government

---

[8] "*Ejusdem generis*[, or 'of the same kind,'] is a tool for determining 'the correct meaning of words when there is uncertainty. Ordinarily, it limits general terms which follow specific ones to matters similar to those specified.'" *Bay Cty., Fla. v. United States*, 796 F.3d 1369, 1376 (Fed. Cir. 2015) (quoting *Gooch v. United States*, 297 U.S. 124, 128 (1936)).

argues for the use of context and "a reasonably intelligent person acquainted with the contemporaneous circumstances" standard.  Pl.'s Reply at 18; Def.'s Reply at 20 (quoting *Enron Fed. Sols., Inc. v. United States*, 80 Fed. Cl. 382, 393 (2008); *Armour of Am. v. United States*, 96 Fed. Cl. 726, 737 (2010)).  Plaintiff asserts:

> [Its] interpretation [of miscellaneous debris] is especially reasonable when it is juxtaposed with USACE's assertion that it has no knowledge of cables, pipes, or other artificial obstructions or of any wrecks, wreckage, or other material that would necessitate the employment of additional equipment for economical removal.  That is a clear statement that there are no known artificial items.

Pl.'s Reply at 19.  The government argues plaintiff fails to show the contract made "an 'affirmative' representation regarding the nature and amount of debris to be encountered." Def.'s Reply at 20 (first citing *Int'l Tech. Corp.*, 523 F.3d at 1348; and then citing *H.B. Mac, Inc.,* 153 F.3d at 1347).

While the parties dispute the correct way to interpret the contract, both parties failed to establish how "a reasonable and prudent contractor . . . would act in interpreting the contract documents."  *H.B. Mac, Inc.*, 153 F.3d at 1345; *P.J. Maffei Bldg. Wrecking Corp.*, 732 F.2d at 917 (citing *H. N. Bailey & Assocs. v. United States,* 449 F.2d 387, 390 (Ct. Cl. 1971); *Hegeman-Harris & Co. v. United States,* 440 F.2d 1009, 1016 (Ct. Cl. 1971)); *see RDA Constr. Corp. v. United States*, 132 Fed. Cl. 732, 772–73 (2017) (citing expert testimony on how a reasonable and prudent contractor would interpret the contract in question), *aff'd*, 739 F. App'x 644 (Fed. Cir. 2018).  In particular, neither party puts forth evidence of how a reasonable and prudent contractor would interpret the government's knowledge disclaimer as to artificial obstructions and wrecks.  In the context of this contract, it may be the case a reasonable and prudent contractor would put great weight on the government's affirmative representation that it has no knowledge of artificial obstructions or wrecks.  *Comtrol*, 294 F.3d at 1363; *H.B. Mac, Inc.*, 153 F.3d 1347.  The government's knowledge disclaimer may be particularly relevant to such a contractor given the waterway is under the control and supervision of the U.S. Coast Guard and regularly maintained by the USACE.  *See generally* Ex. K (the USACE's specifications for dredging the waterway in 2002, 2003, 2007, 2009, 2011, and 2014); Ex. J. at 78 (the USACE's 2015 dredging specification).  Considering the waterway is under the government's control, it is unclear how a reasonable and prudent contractor would interpret the government's affirmative representation it lacked knowledge of artificial obstructions; thus, "the Court concludes that the 'better course' here . . . is to deny the cross motions for summary judgment and proceed to a full trial."  *Weston/Bean Joint Venture v. United States*, 115 Fed. Cl. 215, 218 (2014) (citing *Anderson*, 477 U.S. at 255) (denying summary judgment due to disputes of material fact as to what the contract clauses "indicated"); *see also RDA Constr. Corp.*, 132 Fed. Cl. at 772–73 (citing expert testimony on how a reasonable and prudent contractor would interpret the contract in question).

### D.     Plaintiff's Claims the USACE Withheld Superior Knowledge

Plaintiff and the government cross-motion for summary judgment on four counts of breach of contract due to the government withholding superior knowledge of:  minimum pipe

size, log traffic, debris, and clay.  Pl.'s MSJ at 1–2; Def.'s Cross-MSJ at ii; Tr. at 131:17–132:14 (both parties agreeing failure to disclose superior knowledge requires an excusable delay analysis).  "The superior knowledge doctrine imposes upon a contracting agency an implied duty to disclose to a contractor otherwise unavailable information regarding some novel matter affecting the contract that is vital to its performance."  *Giesler v. United States*, 232 F.3d 864, 876 (Fed. Cir. 2000); *see also McCormick Constr. Co. v. United States*, 18 Cl. Ct. 259, 265 (1989) (quoting *Util. Contractors, Inc. v. United States*, 8 Cl. Ct. 42, 52 (1985), *aff'd*, 790 F.2d 90 (Fed. Cir. 1986)) ("Superior knowledge is 'knowledge which is vital to performance of the contract but which is unknown and is not reasonably available to bidders who are thereby misled.'"), *aff'd*, 907 F.2d 159 (Fed. Cir. 1990).  "This 'superior knowledge' doctrine can, in limited circumstances, supply the basis for a breach of contract."  *GAF Corp. v. United States*, 932 F.2d 947, 949 (Fed. Cir. 1991).

To show a breach of contract under the superior knowledge doctrine, plaintiff must produce specific evidence that it:  (1) "undertook to perform without vital knowledge of a fact that affects performance costs or duration; (2) the government was aware [plaintiff] had no knowledge of and had no reason to obtain such information; (3) any contract specification supplied misled [plaintiff] or did not put it on notice to inquire; and (4) the government failed to provide the relevant information."  *Giesler*, 232 F.3d at 876 (citing *Hercules Inc. v. United States*, 24 F.3d 188, 196 (Fed. Cir. 1994), *aff'd*, 516 U.S. 417 (1996)).

## 1.   Whether the USACE Withheld Superior Knowledge of a Minimum Pipe Size

Plaintiff argues the government failed to disclose its superior knowledge of the 12" minimum sufficient discharge pipe size in the 2014 solicitation.  Pl.'s MSJ at 65.  According to plaintiff, a 12" discharge pipe was necessary to do the project, evidenced by the fact that four out of the five solicitations preceding 2014 required "[a] hydraulic (pipeline) dredge plant of sufficient size (minimum 12" at discharge)."  *Id.* at 61–62 (citing the 2002, 2007, 2009, and 2011 solicitations for dredging the waterway); *see also* Ex. J. at 78 (the 2015 resolicitation reinserted the 12" minimum discharge pipe size).  The government withheld the pipe size information to increase competition on the solicitation, argues plaintiff.  Pl.'s MSJ at 65.  Plaintiff states it "was led to believe that its Toyo pumps, with their 10" pipes, would be sufficient to move the described materials."  *Id.*  Plaintiff asserts the minimum pipe size qualifies as superior knowledge because the Competition in Contracting Act ("CICA") required the government to use the least restrictive specifications to complete the job in the pre-2014 solicitations.  Pl.'s Reply at 22–23 (citing 41 U.S.C. § 253(a) (1994); 10 U.S.C. § 2305(a)(1) (1994); 48 C.F.R. §§ 11.002(a)(1)(ii), 14.101(a) (1998)).[9]  Therefore, plaintiff argues if the minimum 12" pipe size was the least restrictive specification before 2014, then it must have been the minimum sufficient pipe size in 2014.  *Id.*

The government responds, "[t]here is no evidence in the record to support [plaintiff's] assertion that USACE believed that 'a narrower pipe was not sufficient' at the time of the project

---

[9] The statute plaintiff cites, 41 U.S.C. § 253(a), last appeared in the United States Code in 2011, when Congress recodified title 41.  *See generally* Pub. L. No. 111-350, 124 Stat. 3677 (2011).  The language of former § 253(a) now appears in 41 U.S.C. § 3301 (2018).

solicitation, or at any time at all for that matter." Def.'s Cross-MSJ at 42. According to the government, eliminating the minimum pipe size requirement was an effort to create a "performance specification" based solicitation. *Id.* (citing Def.'s Cross-MSJ App. at 480 ("[T]he whole point of a performance contract, performance-based contract, is that we don't dictate means and methods. If we wanted to do that, we would have put it in the specs and it would not have been a performance-based contract." (deposition of contracting officer Elizabeth Chien at 71:2-8)). The government argues there is no evidence 12" is the minimum size necessary, and if it were, the government would not sabotage its own contract by intentionally withholding a required specification. Def.'s Reply at 21. The government asserts even plaintiff does not believe a 12" pipe is required because plaintiff argues it could have completed the project with more time using its 10" pipe. Def.'s Reply at 21–22.

Regarding the first element, whether plaintiff "undertook to perform without vital knowledge of a fact that affects performance costs or duration," there is no dispute plaintiff was unaware of the 12" minimum pipe size requirement from past solicitations because the USACE removed that requirement in 2014. Pl.'s MSJ at 61–63; Def.'s Cross-MSJ at 41–42; *Giesler*, 232 F.3d at 876. The government also removed the provision notifying bidders of the availability of prior dredging records, which would have presumably included the past solicitations with the minimum pipe size requirement—all five of the previous solicitations and the 2015 resolicitation contained the prior dredging record notice. *See* Ex. K (the 2002, 2003, 2007, 2009, and 2011 specifications all stating "records of previous dredging, sediment analyses, and detailed current conditions surveys are available for inspection"); Ex. J. at 78 (same). Plaintiff accordingly had no way to learn of this fact, even if it wanted to. *Giesler*, 232 F.3d at 876.

Further, the government included the 12" minimum pipe size requirement in four of the five previous solicitations for this dredging contract, and then reinserted the requirement in the 2015 resolicitation after plaintiff failed to perform the contract with its 10" pipe. Pl.'s MSJ at 61–62 (citing the 2002, 2007, 2009, and 2011 solicitations for dredging the waterway); Ex. J. at 78 (the 2015 resolicitation). The CICA requires the government to only use restrictive conditions "to the extent necessary" to complete the job. 48 C.F.R. § 11.002(a)(1)(ii); 41 U.S.C. § 3301(a); 10 U.S.C. § 2305(a)(1) (requiring agencies to "solicit bids or proposals in a manner designed to achieve full and open competition for the procurement."). Assuming the government abided by the law in the years before and after 2014, the inclusion of a minimum 12" pipe size necessarily implies this is the least restrictive means to complete the contract—the government even stated 12" is the minimum "sufficient" discharge pipe size. Ex. K at 9, 13, 16, 21 (the 2002, 2007, 2009, and 2011 solicitations all describing a 12" pipe size as minimally sufficient) Ex. A at 3, ECF No. 80-1 (deposition of USACE project manager John Pell at 14:15–25 (excerpts)) (stating the government believed in 2009 12" was the minimum sufficient pipe size). Accordingly, under this particular dredging contract, the government made the minimum discharge pipe size into "knowledge which is vital to performance of the contract." *McCormick*, 18 Cl. Ct. at 265; *Util. Contractors, Inc.*, 8 Cl. Ct. at 52; *Giesler*, 232 F.3d at 876.

The government argues a smaller pipe size *could* be sufficient to complete the project, but the government's argument misses the point. Def.'s Cross-MSJ at 41–42. For years, the government identified 12" as the minimum "sufficient" pipe size to complete the project. Ex. K at 9, 13, 16, 21 (the 2002, 2007, 2009, and 2011 solicitations all describing a 12" pipe size as

minimally sufficient).  Even if a narrower pipe size may have been sufficient under the right circumstances as the government asserts, Def.'s Cross-MSJ at 42, that does not change the fact the government made pipe size vital to the contract and then failed to disclose it.  *Giesler*, 232 F.3d at 876.  Once the government sets a minimum requirement for a solicitation, it is not required to maintain that minimum requirement for every subsequent solicitation.  Where, however, the government establishes a minimum requirement that it uses for several years—one it identifies multiple times as minimally "sufficient"—and then fails to inform bidders that it has removed the minimum requirement, the government impermissibly withholds vital knowledge.  *Giesler*, 232 F.3d at 876; *Panoramic Studios, Inc. v. United States*, 413 F.2d 1156, 1166–67 (Ct. Cl. 1969) ("[T]he Government has an affirmative duty to reveal what it knows to bidders . . . ."); *Helene Curtis Indus., Inc. v. United States*, 312 F.2d 774, 778 (Ct. Cl. 1963) (citation omitted) ("Although it is not a fiduciary toward its contractors, the [g]overnment—where the balance of knowledge is so clearly on its side—can no more betray a contractor into a ruinous course of action by silence than by the written or spoken word."); *Util. Contractors, Inc.*, 8 Cl. Ct. at 52.

Lastly, the minimum pipe size affected the performance costs and duration of the contract, as evidenced by the significant delays and costs caused by clogs in plaintiff's 10" pipe.  Pl.'s MSJ at 41–54 (citing Ex. H at 37–51 (plaintiff's interrogatory response including photos of debris and description of the clogs and delays arising therefrom); Ex. L (daily construction reports of the delay cause by machinery clogs)); Tr. at 20:1–11 (plaintiff's counsel stating debris would make it through the equipment, only to clog plaintiff's discharge pipe, forcing plaintiff to cease dredging "to raise up a section of the sunken pipe and try to get it out").  Although the difference between a 12" pipe and a 10" pipe appears minor, a 10" pipe has a 31% smaller cross-sectional area than a 12" pipe.[10]  Pl.'s MSJ at 65.  This change affects the fluid velocity and pressure drop which, in turn, affects dredging performance.  A smaller pipe would also increase the likelihood of delays due to clogs than would otherwise occur with a larger pipe.  *See* Ex. L (daily construction reports of the delay caused by machinery clogs).  Accordingly, the Court finds plaintiff "undertook to perform [the contract] without vital knowledge of a fact that affects performance costs [and] duration."  *Giesler*, 232 F.3d at 876.  Plaintiff has successfully shown the first element of the superior knowledge doctrine for minimum pipe size.  *Id.*

Regarding the second element, whether "the government was aware [plaintiff] had no knowledge of and had no reason to obtain [the] information," the USACE admitted it removed the pipe size requirement to increase bidding on the project, so it must have known plaintiff lacked that knowledge.  *Id.*; Ex. A at 3 (deposition of USACE project manager John Pell at 15:3–12 (excerpts)) (stating the government removed the minimum sufficient pipe size due to the project only receiving "one bid or no bids").  The government does not argue plaintiff had reason to obtain the pipe size information, either; instead, despite its solicitations before and after 2014 defining 12" as minimally sufficient, the government rests on its assertion a smaller pipe size was sufficient.  Def.'s Cross-MSJ at 41–42.  Even assuming plaintiff had reason to obtain the pipe size information, it could not because the government also removed in 2014, and reinserted in 2015, the notice to bidders that records of previous dredging are available for inspection.  *See*

---

[10] The cross-sectional area of a circular pipe is a function of its radius squared: $A = \pi r^2$.  Accordingly, by allowing plaintiff to proceed with a 10" diameter pipe instead of a 12" diameter pipe, the government allowed plaintiff to perform with dredging equipment comprising a 31% lower cross-sectional area, which undoubtedly affected performance.

Ex. K (the 2002, 2003, 2007, 2009, 2011, and 2014 specifications); Ex. J at 10 (the 2015 resolicitation). The Court finds the government was aware plaintiff "had no knowledge" of the 12" minimum pipe size requirement "and had no reason to obtain such information." *Giesler*, 232 F.3d at 876. Plaintiff satisfies the second element of the superior knowledge doctrine for minimum pipe size. *Id.*; *GAF Corp.*, 932 F.2d at 949; *Hercules Inc.,* 24 F.3d at 196.

For the third and fourth elements, whether the contract specification misled or put plaintiff on notice to inquire and whether the government failed to provide the relevant information, the government failed to indicate that pipe size would be important to completing the project. *See* Def.'s Cross-MSJ App. at 1–130 (the 2014 dredging contract). Without prior dredging records or any reason to doubt the sufficiency of its equipment to complete the project, plaintiff would have no reason to inquire about such a detail. *See* Ex. K (the 2002, 2003, 2007, 2009, and 2011 specifications, but not the 2014 specification, all stating "records of previous dredging, sediment analyses, and detailed current conditions surveys are available for inspection"); Ex. J. at 78 (the 2015 specification stating the same); Ex. J at 10, 63–64 (plaintiff has over 60 years of Pacific Northwest experience dredging ports, rivers, and waterways, averaging 200,000 cubic yards dredged annually). The government's silence as to pipe size could mislead bidders to surmise a pipe size much smaller than 12" would be adequate, without knowing the government for years described 12" as the minimally "sufficient" size. *See Helene Curtis Indus., Inc.*, 312 F.2d at 778 ("Although it is not a fiduciary toward its contractors, the [g]overnment—where the balance of knowledge is so clearly on its side—can no more betray a contractor into a ruinous course of action by silence than by the written or spoken word."). The government does not argue plaintiff was on notice or that it provided the relevant information. *See* Def.'s Cross-MSJ at 41–43; Def.'s Reply at 21–22. Accordingly, the Court finds the contract specification did not put plaintiff on notice to inquire about pipe size and the government failed to provide the relevant information. *Giesler*, 232 F.3d at 876. Plaintiff satisfies the third and fourth elements of its superior knowledge doctrine claim for minimum pipe size. *Id.*

The Court finds no dispute of material fact that the government withheld superior knowledge of a minimum sufficient pipe size. *Id.*; *Matsushita*, 475 U.S. at 587. The Court grants plaintiff's motion for summary judgment and denies the government's motion for summary judgment on this issue. *Giesler*, 232 F.3d at 876; *GAF Corp.*, 932 F.2d at 949; *Hercules Inc.*, 24 F.3d at 196.

### 2.    Whether the USACE Withheld Superior Knowledge of Log Traffic

Plaintiff alleges the government knowingly withheld superior knowledge of log traffic because "[i]t removed the warning about large logs and trees moving with the currents and damaging contractor's equipment." Pl.'s MSJ at 71. Plaintiff argues it bid on the solicitation at issue "without knowledge" of this "vital information." *Id.* As a result, plaintiff states "its pipes were destroyed by the logs[,] negatively affecting production and the repetitive costs associated with fixing broken pipes (labor, equipment, and replacement pipe) affect the total cost of the project." *Id.* Additionally, plaintiff argues any bidder inquiry regarding log traffic did not become part of the contract because the government did not incorporate them by amendment.

Pl.'s Reply at 24–25 (citing *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1311 (Fed. Cir. 2016)).

The government responds to plaintiff's log traffic claims by stating, "[t]he solicitation warned bidders that they must 'be satisfied before submitting [a] bid as to the hazards likely to arise from weather conditions,' and further warned bidders to expect to encounter 'sunken logs' and 'stumps,'—which would obviously have been 'floating logs' at some point in time." Def.'s Cross-MSJ at 44 (citing Def.'s Cross-MSJ App. at 43, 123 (contract)). Plaintiff was also warned about floating log traffic in a bidder inquiry, according to the government, which described "water conditions that can change quickly due to weather and to be aware of trees coming down the river." *Id.* (citing Def.'s Cross-MSJ App. at 282 (15 August 2014 bidder inquiry)). By warning of log traffic in a bidder inquiry prior to plaintiff's bid, the government asserts the information was reasonably available so plaintiff's superior knowledge claim must fail. Def.'s Reply at 22–23.

Regarding the first element, whether plaintiff "undertook to perform without vital knowledge of a fact that affects performance costs or duration," plaintiff asserts, and the government does not dispute, it "undertook to perform the dredging at issue without knowledge that large logs and trees move with the currents and can damage [its] equipment." Pl.'s MSJ at 71; *Giesler*, 232 F.3d at 876. Plaintiff argues, undisputed, "[t]he log traffic affected performance and costs" due to the logs repetitively breaking plaintiff's pipes. Pl.'s MSJ at 71; *Giesler*, 232 F.3d at 876. This issue is uncontested; accordingly, the Court finds plaintiff has satisfied the first element of its log traffic superior knowledge claim. *Giesler*, 232 F.3d at 876.

Regarding the second, third, and fourth elements of plaintiff's log traffic superior knowledge claim, *id.*, plaintiff fails to satisfy these elements because plaintiff has not shown that knowledge of floating log traffic was "not reasonably available to bidders." *McCormick,* 18 Cl. Ct. at 265 (quoting *Util. Contractors, Inc.*, 8 Cl. Ct. at 52). On 15 August 2014, ten days before plaintiff submitted its bid, a bidder inquiry was entered warning of "water conditions that can change quickly due to weather and to be aware of trees coming down the river." Def.'s Cross-MSJ App. at 282 (15 August 2014 public bidder inquiry warning of log traffic). The solicitation warned that "bidders will be held to have reviewed the questions and responses in ProjNet-BID prior to bid submission." Def.'s Cross-MSJ App. at 133 (the 2014 solicitation). It was plaintiff's standard practice to review such inquiries when preparing a project bid. Def.'s Cross-MSJ App. at 287, 359, 390–91 (depositions of MIC employee Michael Harrison at 31:9-20, MIC co-owner Joseph Bernert at 25:2-13, and MIC President David Bernert at 21:25-22:3, all testifying typically review bidder inquiries). Yet plaintiff does not argue, nor does it present any evidence, that it ever reviewed the bidder inquiries prior to bidding on this particular contract. *See* Pl.'s Reply 24–25; Def.'s Cross-MSJ at 6 (citing multiple depositions of plaintiff's employees testifying they typically review bidder inquiries but did not in this instance). In addition, the contract warned plaintiff of "sunken logs" and "stumps," which were necessarily floating logs at some point. Def.'s Cross-MSJ App. at 123 (the 2014 contract stating "[t]he [c]ontractor may encounter . . . sunken logs [and] stumps"). Accordingly, plaintiff cannot show the government was aware plaintiff had no knowledge of log traffic and had no reason to obtain such information, element two, because such information was "reasonably available to bidders." *McCormick,* 18 Cl. Ct. at 265 (quoting *Util. Contractors, Inc.*, 8 Cl. Ct. at 52); *Giesler*, 232 F.3d

at 876.  Plaintiff cannot show the supplied contract specification misled it—element three—because the contract warned plaintiff of "sunken logs" and "stumps," and the bidder inquiries plaintiff was required to review warned of floating log traffic.  *See* Def.'s Cross-MSJ App. at 123 (the 2014 contract); *McCormick*, 18 Cl. Ct. at 265; *Giesler*, 232 F.3d at 876.  Plaintiff lastly cannot show the government failed to provide the log traffic information because it provided the relevant bidder inquiry ten days before plaintiff submitted its bid and warned plaintiff of sunken logs and stumps, element four.  *Giesler*, 232 F.3d at 876; *Delhur Indus., Inc.*, 95 Fed. Cl. at 457 (citing *Randa/Madison Joint Venture III*, 239 F.3d at 1270–72) ("A contractor has a duty to review information referred to and made available for inspection in the contract documents.").

The Court finds no dispute of material fact that the government did not withhold superior knowledge of log traffic.  *Giesler*, 232 F.3d at 876; *Matsushita*, 475 U.S. at 587.  The Court grants the government's motion for summary judgment and denies plaintiff's motion for summary judgment on this issue.  *GAF Corp.*, 932 F.2d at 949; *Hercules Inc.*, 24 F.3d at 196.

### 3.    Whether the USACE Withheld Superior Knowledge of Debris

Like log traffic, plaintiff argues it bid on the solicitation without knowledge of the "substantial quantities of man-made debris and sunken vessels" in the boat basin.  Pl.'s MSJ at 76.  Plaintiff states, "[t]he debris affected performance and costs as [plaintiff] could not dredge when its dredge was clogged by debris or its dredge was damaged by sunken vessels, and the repetitive costs . . . of removing clogs and debris (labor, equipment, and replacement equipment) affect the total cost of the project."  *Id.*  The government knew plaintiff was unaware of the man-made debris, according to plaintiff, because it removed the warnings from past solicitations of: "Debris including fish nets, steel trolling wire, and machinery may be found in the basin area requiring frequent downtime for cleanouts and disposal. . . .  Sunken boats, fishnets and other miscellaneous debris may be encountered . . . ."  *Id.*; *compare* Ex. K at 1–2 (2014 solicitation) *with id.* at 9–10 (2011 solicitation), *and id.* at 13 (2009 solicitation), *and id.* at 16 (2007 solicitation), *and id.* at 19 (2003 solicitation), *and id.* at 21–22 (2002 solicitation).  Plaintiff asserts a pre-bid site visit would not have revealed the debris at issue.  Pl.'s Reply at 25; *see* Ex. J at 73 (the resolicitation stating, "[p]ortions of the marina boat basin have not been dredged since 1982.").  Plaintiff therefore claims the government withheld superior knowledge.  Pl.'s MSJ at 76.

The government responds by stating the solicitation warned about "miscellaneous debris," just as the pre-2014 solicitations characterized the debris of which plaintiff complains.  Def.'s Cross-MSJ at 44–45; *but see* Tr. at 202:5–8 (government counsel stating, "in hindsight, would it have been even clearer to keep [the warning] language in [in 2014]?  Sure.  Did the government put that language back in later?  Sure.").  The government also asserts the existence of debris was reasonably available if only plaintiff conducted a pre-bid site visit.  Def.'s Cross-MSJ at 45 (citing Def.'s Cross-MSJ App. at 526–27 (email internal to plaintiff describing steel and lead line in the dredging area an employee witnessed on a 30 September 2014 visit)).

For the first element of plaintiff's debris superior knowledge claim—whether plaintiff "undertook to perform without vital knowledge of a fact that affects performance costs or duration"—plaintiff alleges it lacked any "knowledge of the substantial quantities of man-made

debris and sunken vessels it encountered in the [b]oat [b]asin." Pl.'s MSJ at 76; *Giesler*, 232 F.3d at 876. The government does not dispute plaintiff's lack of knowledge as to debris in the boat basin. *See* Def.'s Cross-MSJ at 44–45. No evidence in the record indicates plaintiff had knowledge of the over thirty years of man-made debris or sunken vessels accumulated in the boat basin. *See* Ex. J at 73 (the 2015 resolicitation stating, "[p]ortions of the marina boat basin have not been dredged since 1982"). The effect debris had on plaintiff's costs and performance is also undisputed. *See* Pl.'s MSJ at 76; Def.'s Cross-MSJ at 44–45; Ex. H at 37–51 (plaintiff's interrogatory response including photos of debris and description of the clogs and delays arising therefrom); Ex. L (daily construction reports of the delay cause by clogs)); Tr. at 20:1–11 (plaintiff's counsel stating the debris would make it through the equipment, only to create a clog in plaintiff's discharge pipe, forcing plaintiff to cease dredging "to raise up a section of the sunken pipe and try to get it out"). Accordingly, the Court finds plaintiff "undertook to perform without vital knowledge of a fact that affects performance costs or duration." *Giesler*, 232 F.3d at 876.

Regarding the second element—whether "the government was aware [plaintiff] had no knowledge of and had no reason to obtain the information," *id.*—in the five preceding specifications for this project, the government warned: "Debris including fish nets, steel trolling wire, and machinery may be found in the basin area requiring frequent downtime for cleanouts and disposal. . . . Sunken boats, fishnets and other miscellaneous debris may be encountered . . . ." Ex. K at 9–10, 13, 16, 19, 21–22 (comparison of solicitations from 2014, 2009, 2007. 2003, and 2002). In 2014, the government instead stated bidders "may encounter accumulations of forest trash, sunken logs, stumps, and miscellaneous debris. . . . Except as indicated, the [g]overnment has no knowledge of cables, pipes, or other artificial obstructions or of any wrecks, wreckage, or other material that would necessitate . . . additional equipment for economical removal." Ex. K at 1–2 (2014 solicitation). The government posits its "miscellaneous debris" warning justifies its ignorance as to plaintiff's lack of knowledge of the man-made debris and vessels—it does not. Def.'s Cross-MSJ at 44–45; *Giesler*, 232 F.3d at 876. By warning of miscellaneous debris,[11] such as forest trash, logs, and stumps, while simultaneously denying any knowledge of artificial obstructions or wrecks, the government effectively guaranteed any contractor would have no advanced knowledge of the artificial debris it would encounter. *Fehlhaber Corp.*, 151 F. Supp. at 825 ("Plaintiff had a right to rely on the [g]overnment's specifications and drawings and the [g]overnment is bound by any assertions made therein . . . ."). From a bidder's perspective, if the contracting agency preemptively stated it had no knowledge of such things, then most bidders would exercise their "right to rely on the

---

[11] "*Ejusdem generis* is a tool for determining 'the correct meaning of words when there is uncertainty. Ordinarily, it limits general terms which follow specific ones to matters similar to those specified.'" *Bay Cnty., Fla.*, 796 F.3d at 1376 (quoting *Gooch*, 297 U.S. at 128). Accordingly, understanding "miscellaneous debris" in the context of the 2014 specification, it must be limited to natural items arising from a forest environment. Ex. K at 1–2 (2014 solicitation); *Bay Cnty., Fla.*, 796 F.3d at 1376. The government argues this interpretation is "completely illogical" because "common sense" would dictate the presence of some man-made debris. Def.'s Reply at 20. This interpretation follows naturally, however, from the "context" of the government's specification. *Enron Fed. Sols.*, 80 Fed. Cl. at 393. The very next paragraph in the specification denies having any knowledge of artificial obstructions or wrecks, so to interpret the government's warning of "miscellaneous debris" in the previous paragraph as including artificial obstructions or wrecks is what would be "completely illogical." Ex. K at 1–2 (2014 solicitation); Def.'s Reply at 20. The government cannot claim it warned plaintiff of artificial debris in one breath and deny any knowledge of artificial debris in the next.

[g]overnment's specifications," as it would be highly unlikely any investigation or inquiry on the part of the bidder would reveal any more information.  *Id.*  By making such patently false representations, the government must have been fully aware plaintiff was without knowledge of the over thirty years of man-made debris and sunken vessels that awaited plaintiff in the boat basin.  *Giesler*, 232 F.3d at 876.  Plaintiff could not possibly possess knowledge which the on-site contracting agency allegedly lacked.  *Morrison-Knudsen Co. v. United States*, 345 F.2d 535, 539 (Ct. Cl. 1965) ("It was not incumbent upon the plaintiff, prior to submitting its bid and entering into the contract, to conduct its own investigation in order to ascertain the truth or falsity of the defendant's positive assertions . . . .").  The government was quite aware of artificial obstructions and wrecks when it drafted the 2002, 2003, 2007, 2009, and 2011 specifications, so it was baseless for the government to deny having any such knowledge in the 2014 specification.  *See* Ex. K (comparison of solicitations from 2014, 2011, 2009, 2007, 2003, and 2002); Ex. A at 4 (deposition of USACE project manager John Pell at 21:8–18 (excerpts)) (stating the warnings were removed to increase bidding, not because the artificial obstructions and wrecks had been cleaned up); Ex. J at 73 (the 2015 resolicitation stating, "[p]ortions of the marina boat basin have not been dredged since 1982," which the government presumably knew in 2014).

Regarding whether plaintiff had reason to obtain the debris information, plaintiff's failure to "examine the site of work and verify the character or materials," as the contract expressly advised, is not fatal to plaintiff's claim.  Def.'s Cross-MSJ App. at 123 (the 2014 contract).  The man-made debris plaintiff encountered were beneath the water and invisible prior to bidding on the contract.  Pl.'s Reply at 20 (citing Second Bowser Decl. Ex. X at 3, ECF No. 88-3 (deposition of contracting officer Bonilie Lackey at 80:17–19 (excerpts)) ("That's why we don't have site visits for dredging contracts, because there isn't anything to see above water.").  The USACE contracting officer acknowledged a site visit would not reveal what is beneath the water.  *Id.*  Accordingly, the government was also aware plaintiff "had no reason to obtain the information," because a site visit would not have led plaintiff to discover the significant quantity of man-made debris it encountered dredging the boat basin.[12]  *Giesler*, 232 F.3d at 876.

Further, the government argues "some amount" of artificial debris should have been expected because "context defines a contract and the issues deriving thereof," *Enron Fed. Sols.*, 80 Fed. Cl. at 393, and language "must be given that meaning that would be derived from the contract by a reasonabl[y] intelligent person acquainted with the contemporaneous

---

[12] The government asserts the debris was reasonably available to plaintiff because a pre-bid site visit would have revealed the man-made debris.  Def.'s Cross-MSJ at 45.  The government argues the information was reasonably available because plaintiff, on a post-bid site visit, observed chunks of steel being used as anchors, observed fishermen discarding lead line into the water, and learned vessels had previously sunken in the marina.  *Id.*  Even if plaintiff learned of these things prior to bidding, however, none of them would have informed plaintiff of the over thirty years of man-made debris accumulated from the boat basin's use as a "garbage dump."  Ex. A at 18 (deposition of USACE project manager John Pell at 135:9–22 (excerpts)) (acknowledging the USACE's difficulty with getting Tribe members to stop dumping garbage in the marina); Ex. J at 73 (the resolicitation stating, "[p]ortions of the marina boat basin have not been dredged since 1982."); *McCormick*, 18 Cl. Ct. at 265. Additionally, hearing of a few sunken vessels in the channel through a conversation with a local dock manager does not make knowledge of sunken vessels "reasonably available."  *Id.*  The government cannot turn contractors on site visits into detectives on crime scenes for the purpose of uncovering government-withheld vital information.  *Id.*; *Morrison-Knudsen Co.*, 345 F.2d at 539 ("It was not incumbent upon the plaintiff, prior to submitting its bid and entering into the contract, to conduct its own investigation in order to ascertain the truth or falsity of the defendant's positive assertions . . . .").

circumstances." *Armour of Am.*, 96 Fed. Cl. at 737 (citation omitted); Def.'s Reply at 20.  Even accepting the government's argument as true—plaintiff should have expected some artificial debris—no contractor could have discovered the boat basin contained over thirty years of man-made debris accumulated from its use as a "garbage dump." *Giesler*, 232 F.3d at 876 ("The superior knowledge doctrine imposes upon a contracting agency an implied duty to disclose to a contractor otherwise unavailable information regarding some novel matter affecting the contract that is vital to its performance."); Ex. J at 73 (the resolicitation stating, "[p]ortions of the marina boat basin have not been dredged since 1982."); Bowser Decl. Ex. A at 18, ECF No. 80-1 (deposition of USACE project manager John Pell at 135:9–22 (excerpts)) (acknowledging the USACE's difficulty with getting Tribe members to stop dumping garbage in the marina).  The Court finds "the government was aware [plaintiff] had no knowledge of and had no reason to obtain the information" pertaining to artificial debris. *Giesler*, 232 F.3d at 876.  Plaintiff successfully establishes the second element of its debris superior knowledge claim. *Id.*; *see also McCormick*, 18 Cl. Ct. at 265.

For the third element—whether the contract specification misled plaintiff or did not put it on notice to inquire, *Giesler*, 232 F.3d at 876—the 2014 specification, as discussed under element two above, gave plaintiff no advanced knowledge of the artificial debris it could expect to encounter. Ex. K at 1–2 (2014 solicitation).  The specification preemptively stated the government had no knowledge of artificial obstructions or wreckages, giving plaintiff no reason to inquire about such things. *Fehlhaber Corp.*, 151 F. Supp. at 825 ("Plaintiff had a right to rely on the [g]overnment's specifications and drawings and the [g]overnment is bound by any assertions made therein . . . .").  By making such representations, the government misled plaintiff regarding the government's knowledge of the man-made debris and wreckages present in the boat basin. *Giesler*, 232 F.3d at 876; Ex. J at 73 (the resolicitation stating, "[p]ortions of the marina boat basin have not been dredged since 1982"); Ex. A at 18 (deposition of USACE project manager John Pell at 135:9–22 (excerpts)) (acknowledging the USACE's difficulty with getting Tribe members to stop dumping garbage in the marina); Ex. K at 9–10, 13, 16, 19, 21–22 (the government warning bidders about artificial debris and sunken vessels in 2002, 2003, 2007, 2009, and 2011).  Moreover, although plaintiff failed to perform a pre-bid site visit, the USACE contracting officer acknowledged a site visit would not reveal what is beneath the water. Ex. X at 164 (deposition of contracting officer Bonilie Lackey at 80:14–19 (excerpts)).  Accordingly, even if plaintiff performed a site visit, the significant quantity of man-made debris would have nevertheless been "unknown and . . . not reasonably available" to plaintiff.[13] *McCormick*, 18 Cl. Ct. at 265 (quoting *Util. Contractors, Inc.*, 8 Cl. Ct. at 52).  Plaintiff successfully establishes the third element of its debris superior knowledge claim. *Giesler*, 232 F.3d at 876.

Regarding the fourth element, whether "the government failed to provide the relevant information," *id.*, the government clearly outlined the pertinent debris and wreckage information in the 2015 resolicitation. *See* Ex. J at 78–79 ("Contractor may encounter accumulations of forest trash, sunken logs, stumps, man-made wood products, wire and synthetic rope, metal debris, fishing nets, tires, and other miscellaneous debris. . . .  There are two reported sunken vessels, . . . and likely [other] accumulations of debris within the boat basin . . . .").  Unfortunately, the government provided no such warning for plaintiff in 2014; the government

---

[13] *See supra* note 12.

instead stated bidders "may encounter accumulations of forest trash, sunken logs, stumps, and miscellaneous debris. . . .  Except as indicated, the [g]overnment has no knowledge of cables, pipes, or other artificial obstructions or of any wrecks, wreckage, or other material that would necessitate . . . additional equipment for economical removal." Ex. K at 1–2 (2014 solicitation). Unlike the resolicitation or any previous solicitation, the 2014 contract fails to mention thirty-years of artificial debris and sunken vessels. *See, e.g.*, Ex. K at 9–10, 13, 16, 19, 21–22 (the government warning bidders about artificial debris and sunken vessels in 2002, 2003, 2007, 2009, and 2011).  Accordingly, the Court finds "the government failed to provide the relevant information," so plaintiff successfully establishes the fourth element of its debris superior knowledge claim.  *Giesler*, 232 F.3d at 876.

The Court finds no dispute of material fact the government withheld superior knowledge of man-made debris and sunken vessels.  *Giesler*, 232 F.3d at 876; *Matsushita*, 475 U.S. at 587. The Court grants plaintiff's motion for summary judgment and denies the government's motion for summary judgment on this issue.  *Giesler*, 232 F.3d at 876; *GAF Corp.*, 932 F.2d at 949; *Hercules Inc.*, 24 F.3d at 196.

### 4. Whether the USACE Withheld Superior Knowledge of Clay

Plaintiff's last superior knowledge claim is based on the government withholding knowledge of clay content in the material to be dredged in the boat basin.  Pl.'s MSJ at 80. Regarding plaintiff's clay differing site condition claim, *supra* Section VI.C.1., the Court finds the government disclosed the presence of clay by reference to a suitability determination which contained sediment sampling results.  Def.'s Cross-MSJ App. at 362 (deposition of MIC co-owner Joseph Bernert at 38:2–18 (excerpts)) (indicating plaintiff did not review the suitability determination containing the sediment contents); *Comtrol*, 294 F.3d at 1364 ("Reasonable reliance cannot exist where the contractor bid without having reviewed the contract documents on which it seeks to rely."); *Delhur Indus., Inc.*, 95 Fed. Cl. at 457 (citing *Randa/Madison Joint Venture III*, 239 F.3d at 1270–72) ("A contractor has a duty to review information referred to and made available for inspection in the contract documents.").  The elements of a differing site condition claim differ in kind from a superior knowledge claim; therefore, the Court still assesses plaintiff's claim the government withheld superior knowledge of clay.

Plaintiff argues the government performed its own testing on the material to be dredged and stated in the solicitation it "is composed of cobbles to fine silts."  Pl.'s MSJ at 80.  Plaintiff asserts the government's own testing showed approximately 7% clay in the boat basin, however, and the government failed to disclose that knowledge.  *Id.*  Plaintiff concludes the presence of clay is a material factor effecting the cost and performance of the contract, so the government therefore failed to disclose superior knowledge.  *Id.* at 80–81.

The government responds by arguing the solicitation's description of "cobbles to fine silts" is not misleading and any knowledge relating to boat basin clay content was "reasonably available to bidders."  Def.'s Cross-MSJ at 45.  According to the government, "clay is entirely consistent with the 'cobbles to fine silts' that the contract identifies, . . . [and] even if it were not, the contract does not 'affirmatively represent that only' cobbles to fine silts would be encountered, to the exclusion of anything else."  Def.'s Reply at 16 (citations omitted).  The

government also offers "the document explicitly identified in the solicitation where [the clay content] information existed" as evidence it did not withhold superior knowledge. *Id.* at 17.

For the first element of plaintiff's clay superior knowledge claim—whether plaintiff "undertook to perform without vital knowledge of a fact that affects performance costs or duration"—plaintiff alleges it had no knowledge of the clay content and the government does not dispute this. *Giesler*, 232 F.3d at 876; *see* Pl.'s MSJ at 80; Def.'s Cross-MSJ at 44–45. No evidence in the record indicates plaintiff had knowledge of the clay content. Additionally, plaintiff alleges the clay affected its costs and performance because the clay slowed its dredging rate. Pl.'s MSJ at 80 (citing Ex. H at 61 (plaintiff's interrogatory response calculating 72.6% decrease in efficiency)). The government included clay content as a "material factor[]" in its cost estimate for the project, so it recognized clay could affect plaintiff's costs and performance. Ex. A at 9 (deposition of USACE project manager John Pell at 59:18–61:3 (excerpts)). Accordingly, the Court finds plaintiff has satisfied the first element of its clay superior knowledge claim. *Giesler*, 232 F.3d at 876.

Regarding the second, third, and fourth elements—"(2) the government was aware [plaintiff] had no knowledge of and had no reason to obtain such information; (3) any contract specification supplied misled [plaintiff] or did not put it on notice to inquire; and (4) the government failed to provide the relevant information"—the solicitation stated the material to be dredged "is composed of cobbles to fine silts." Def.'s Cross-MSJ App. at 273 (2014 solicitation); *Giesler*, 232 F.3d at 876. The government asserts fine silts includes clay under the ASTM version of the Unified Soil Classification System. Def.'s Cross-MSJ at 34; *see* Def.'s Cross-MSJ App. at 522–23 (USACE contracting officer providing plaintiff with "the Soil Classification Table from ASTM D2487" on 8 October 2014, at plaintiff's request). Additionally, the solicitation included a water quality certification with which plaintiff was required to comply. Def.'s Cross-MSJ App. at 258 (the 2014 solicitation stating "The Contractor shall comply with the terms of the Water Quality Certification . . . ."), 263 (the water quality certification contained within the 2014 solicitation). The certification disclosed to all bidders "[s]ediment sampling in the navigation channel and boat basin occurred . . . on October 5, 2010; with results documented in a Suitability Determination (SD) dated January 6, 2011." *Id.* at 263. The publicly available suitability determination stated the boat basin sediment was comprised of "less than 1% gravel, 22% sand, 71% silt, and 7% clay." Pl.'s MSJ at 32 (citing Bowser Decl. Ex. 12 at 2, ECF No. 80-10 (the referenced suitability determination)).

Accordingly, the government was not aware plaintiff lacked knowledge of the clay content because, from the government's perspective, it disclosed the presence of clay within the specification and by reference to a publicly available document. *Giesler*, 232 F.3d at 876. If plaintiff perhaps missed the suitability determination during its "half hour" review of the 150-page solicitation and "was surprised" about the "limited information about sediments," then, it should have been on notice to inquire about such information. Def.'s Cross-MSJ App. at 362 (deposition of MIC co-owner Joseph Bernert at 38:2–18 (excerpts)) (indicating plaintiff did not review the suitability determination containing the sediment contents); 364–65 (deposition of MIC co-owner Joseph Bernert at 40:24–41:3 (excerpts)) ("I was surprised there was no vibracores. There was very limited information about the sediments."). Further, the government did not fail to disclose the presence of clay because it provided that information by reference to a

publicly available document. *McCormick*, 18 Cl. Ct. at 265 (quoting *Util. Contractors, Inc.*, 8 Cl. Ct. at 52) (holding superior knowledge must be "unknown" and "not reasonably available to bidders"). For these reasons, the government was not aware plaintiff had no knowledge of the clay content—the contract specification at least put plaintiff on notice to inquire, and the government did not fail to provide the relevant information because it was, at least, publicly available. *Giesler*, 232 F.3d at 876. Plaintiff fails to establish the second, third, and fourth elements of its clay superior knowledge claim. *Id.*; *GAF Corp.*, 932 F.2d at 949; *Hercules Inc.*, 24 F.3d at 196.

The Court finds no dispute of material fact the government did not withhold superior knowledge of clay content. *Giesler*, 232 F.3d at 876; *Matsushita*, 475 U.S. at 587. The Court grants the government's motion for summary judgment and denies plaintiff's motion for summary judgment on this issue. *Giesler*, 232 F.3d at 876; *GAF Corp.*, 932 F.2d at 949; *Hercules Inc.*, 24 F.3d at 196.

### E.    Whether Plaintiff Would Have Completed the Project Within the Time Sought

The government argues even if plaintiff received the entire 117.5 days of claimed excusable delay, "the termination for default must still be sustained as a matter of law," because plaintiff nevertheless would have failed to complete the contract. Def.'s Cross-MSJ at 46; Def.'s Reply at 4 (quoting *Morganti Nat., Inc.*, 49 Fed. Cl. at 130) ("[A] contractor 'has the burden of establishing by a preponderance of the evidence not only the existence of an excusable cause of delay but also the extent to which completion of the contract work as a whole was delayed' by those causes, and not by delays of its own making."). The government asserts it would have taken plaintiff "another 780 days of non-stop dredging at its total production rate on this project for [plaintiff] to complete the work." Def.'s Cross-MSJ at 46 (measuring plaintiff's daily dredge rate with the 13,011 cubic yards dredged of the required 79,000 over 156 days following the notice to proceed). Lastly, the government disagrees with plaintiff's assertion it would have dredged at 600 cubic yards per day for the entire excusable delay period when plaintiff was only able to sustain that rate for two days and fails to account for any equipment problems, personnel issues, or additional clay delay. Def.'s Reply at 5–7.

Plaintiff initially disputed whether it must demonstrate "it would have completed the contract but for the excusable causes that it identifies." Pl.'s Reply at 8. At oral argument, however, plaintiff conceded it must show it would have completed the contract but for the excusable delay. Tr. at 156:1–17 (discussing the court's holding in *Morganti*). Plaintiff nevertheless cites to testimony from USACE project manager John Pell to support the proposition "that when MIC was permitted to dredge without interruption by storms, MIC was able to dredge 600 [cubic yards] per day." Pl.'s Reply at 10 (citing Second Bowser Decl. Ex. V at 164, ECF No. 88-1 (deposition of USACE project manager John Pell)). Plaintiff argues the project manager "also confirmed that the 600 cubic yards per day was a sufficient rate, barring the substantial weather delay, to complete the project on time." *Id.* (citing Ex. V at 165 (deposition of USACE project manager John Pell)). Therefore, plaintiff argues, even the USACE thought plaintiff's unimpeded rate was sufficient to complete the dredging within the claimed excusable delay time. *Id.*

If asserting its default was excusable, plaintiff must demonstrate it would have completed the contract but for the excusable causes of its failure to timely perform. *Sauer Inc. v. Danzig*, 224 F.3d 1340, 1345 (Fed. Cir. 2000) ("[T]he unforeseeable cause must delay the overall contract completion; *i.e.*, it must affect the critical path of performance."); *Morganti Nat., Inc.*, 49 Fed. Cl. at 134 (affirming a termination for default after concluding a contractor would not have completed the contract but for the excusable delay). Any excusable delays must alter the critical path of the project, "usually result[ing] in a corresponding delay to the completion of the project." *Wilner v. United States*, 24 F.3d 1397, 1399 n.5 (Fed. Cir. 1994). If the Court finds plaintiff's default was excusable, "the rights and obligations of the parties will be the same as if the termination had been issued for the convenience of the Government." FAR 52.249-10(c) (incorporated by reference into the parties' contract, Def.'s Cross-MSJ App. at 15).

The parties agree the determination of whether plaintiff would have completed the contract but for the excusable delays begins with the end of the fish window—1 September 2015. Tr. at 156:6–17 (the parties confirming excusable delay days are added to the post-fish window, so plaintiff's productivity is calculated as if it is performing September and October). The parties disagree, however, on the appropriate method for calculating plaintiff's dredge rate if granted any excusable delay, and present multiple conflicting methods for doing so. For example, in its briefing, plaintiff argues it could have dredged at 600 cubic yards per day and that would have been sufficient to complete the project if granted the claimed 117.5 days of excusable delay. Pl.'s Reply at 10. At oral argument, plaintiff instead asserted it could dredge at 1,600 cubic yards per day. Tr. at 119:3–13. The government disputes each of plaintiff's dredge rate calculations because it asserts neither of them account for "any of the equipment problems, personnel issues, and other delay factors." Def.'s Reply at 6; Tr. at 205:16–206:22 (government counsel at oral argument citing equipment problems, personnel issues, and holidays as unaccounted for in plaintiff's calculations). In its motion, the government argues plaintiff would have needed another 780 days to complete the project. Def.'s Cross-MSJ at 46 (measuring plaintiff's daily dredge rate with the 13,011 cubic yards dredged of the required 79,000 over 156 days following the notice to proceed). Then in its reply brief, the government, under favorable assumptions, says plaintiff would have instead been just 7,000 cubic yards short of completion if granted all 117.5 days of excusable delay. Def.'s Reply at 6–7.

Without considering the number of days, if any, of excusable delay plaintiff is entitled to, the Court finds there are disputes of material fact as to the dredge rate plaintiff could have sustained if granted any excusable delay. *Matsushita*, 475 U.S. at 587; Tr. at 207:13–20 (plaintiff's counsel stating the total days of excusable delay, if any, is to be determined post-summary judgment). Accordingly, the Court declines to enter summary judgment on this issue because it cannot determine whether plaintiff would have completed the contract but for the excusable causes of delay without knowing the rate at which plaintiff would have otherwise performed. *Sauer Inc.*, 224 F.3d at 1345; *Morganti Nat., Inc.*, 49 Fed. Cl. at 134. The parties must present the Court with sufficient evidence to demonstrate whether plaintiff would have completed the project but for the excusable delay in consideration of all material factors, including at least: the time of year, the weather, the equipment used, the material dredged, and debris. *See* Tr. at 156:6–17 (the parties confirming excusable delay days are added to the post-fish window, so plaintiff's productivity is calculated as if it is performing at the beginning of

September 2015).  Plaintiff must also factor in which sources of excusable delay remain to support its requested termination for default conversion and whether plaintiff would have completed the contract but for this lesser amount of excusable delay.  *Sauer Inc.*, 224 F.3d at 1345; *Morganti Nat., Inc.*, 49 Fed. Cl. at 134; Tr. 131:17–132:14 (both parties agreeing failure to disclose superior knowledge requires an excusable delay analysis).  The Court will defer ruling on the issue of whether plaintiff would have completed the contract but for any excusable delay until after trial.

## F.    Summary

To summarize the Court's findings regarding whether plaintiff is entitled to have its termination for default converted to a termination for convenience, plaintiff motioned for summary judgment on various grounds of excusable delay and breach of contract, and the government submitted several motions for summary judgment of its own in defense.  *See supra* Section VI.  First, the government defended against plaintiff's excusable delay and differing site condition claims by arguing plaintiff failed to comply with the contract's notice provisions, FAR 52.249-10, 52.236-2.  *Supra* Section VI.A.  The Court finds plaintiff complied with the excusable delay and differing site condition notice provisions only with respect to debris located in the boat basin.  *Supra* Section VI.A.1.b.  The Court finds plaintiff failed to comply with the notice provisions for its excusable delay and differing site condition claims arising from unusually severe weather, debris outside the boat basin, clay, and floating logs.  *Supra* Section VI.A.1.  In response to the government's motion, plaintiff asserted the government waived the notice provisions; the Court finds the government waived notice as a defense to every claim except plaintiff's clay differing site condition claim.  *Supra* Section VI.A.2.  In addition, plaintiff asserted the government had actual knowledge of plaintiff's claims, but the Court finds there are disputes of material fact and declines to enter summary judgment on actual or constructive notice.  *Supra* Section VI.A.3.  Accordingly, the government's notice defense fails as to all but plaintiff's clay differing site condition claim, and the Court will not decide if the government had actual or constructive notice of that claim because it is moot.  *Supra* Section VI.A.

The Court next addresses plaintiff's several claims on the merits.  *See supra* Sections VI.B.–E.  First, the Court finds plaintiff failed to support its unusually severe weather claim and denies plaintiff any excusable delay as a result of the weather.  *Supra* Section VI.B.  Then, the Court addresses plaintiff's two differing site condition claims for debris and clay, and finds plaintiff failed to establish its clay differing site condition claim, but disputes of material fact prevent the Court from entering summary judgment on plaintiff's debris differing site condition claim.  *Supra* Section VI.C.  Next, plaintiff motioned for summary judgment on four claims that the government withheld superior knowledge of:  a minimum sufficient pipe size, log traffic, debris, and clay.  *Supra* Section VI.D.  The Court finds plaintiff successfully established the government breached the contract under the superior knowledge doctrine for two of its four claims:  minimum sufficient pipe size and debris.  *Supra* Sections VI.D.1., VI.D.3.  Lastly the government argued plaintiff would not have completed the contract but for its claimed excusable delay; the Court finds there are disputes of material fact and declines to enter summary judgment on this issue.  *Supra* Section VI.E.

In sum, plaintiff successfully established only its superior knowledge claims for minimum sufficient pipe size and debris, and disputes of material fact prevent the Court from entering summary judgment on plaintiff's debris differing site condition claim. The government waived its notice defense to all but plaintiff's clay differing site condition claim. The Court declines to enter summary judgment on the government's actual or constructive notice of plaintiff's clay differing site conditions claim, but that issue is now moot because the claim fails on the merits. At least four issues remain for trial to determine whether plaintiff is entitled to have its termination for default converted to a termination for convenience: (1) the remedy for the government's failure to disclose superior knowledge of a minimum sufficient pipe size, *see supra* Section VI.D.1.; (2) the remedy for the government's failure to disclose superior knowledge of debris, *see supra* Section VI.D.3.; (3) whether the debris plaintiff encountered constitutes a differing site condition, and if so, the remedy, *see supra* Section VI.C.2.; and (4) whether plaintiff would have completed the contract but for any excusable delay, s*ee supra* Section VI.E.

## VII.    Whether Plaintiff is Entitled to Compensable Delay

The government next argues it is entitled to summary judgment on "Count I of [plaintiff]'s Second Amended Complaint seeking '$638,260.81 in additional costs,' because any excusable delays [plaintiff] might have suffered were concurrent with delays attributable solely to [plaintiff]." Def.'s Cross-MSJ at 26 (quoting Second Am. Compl. at 8). The government states:

> The parties agree that "the fact that the contractor may also have caused concurrent delay is not fatal to the contractor's claim for additional time due to excusable delay," but that "if a period of delay can be attributed simultaneously to the actions of both the [g]overnment and the contractor, there are said to be concurrent delays, and the result is an excusable but not a compensable delay."

*Id.* at 25 (quoting Pl.'s MSJ at 6). The government points to delays caused by plaintiff's submittal process, defective equipment, and project management as evidence plaintiff's delays were concurrent, not compensable. *Id.* at 25–26.

Plaintiff argues any submittal delay occurring before work commenced would be sequential and thus apportionable. Pl.'s Reply at 29. Plaintiff asserts the causes of compensable delay, such as the weather, clay, and debris, occurred after any delay caused by plaintiff. *Id.* at 30. Plaintiff claims the government fails to establish any specific dates or times for a concurrent delay analysis, and "[o]ne cannot find concurrency when they do not have a time period to reference." *Id.* Therefore, plaintiff argues the government is not entitled to summary judgment on plaintiff's claim to compensable delay. *Id.*

"[N]ot all delays are excusable, and furthermore, not all excusable delays are compensable." *Weaver-Bailey Contractors, Inc. v. United States,* 19 Cl. Ct. 474, 476 (1990). Compensable delay is delay where "the government [is] the sole proximate cause of the contractor's additional loss, and the contractor would not have been delayed for any other reason during that period." *Triax-Pac. v. Stone*, 958 F.2d 351, 354 (Fed. Cir. 1992) (internal quotations

omitted).  Sequential delay is defined as delay "where one party and then the other cause different delays *seriatim* or intermittently." *R.P. Wallace, Inc.*, 63 Fed. Cl. at 410.  "If a period of delay can be attributed simultaneously to the actions of both the [g]overnment and the contractor, there are said to be concurrent delays, and the result is an excusable but not a compensable delay." *Morganti Nat., Inc.*, 49 Fed. Cl. at 132 (quoting *Weaver-Bailey Contractors, Inc.*, 19 Cl. Ct. at 476); *William F. Klingensmith, Inc. v. United States*, 731 F.2d 805, 809 (Fed. Cir. 1984).  Plaintiff "has the burden of establishing by a preponderance of the evidence" the existence of any excusable delay, compensable or otherwise.  *Morganti Nat., Inc.*, 49 Fed. Cl. at 132 (citations omitted); *see Sauer Inc.*, 224 F.3d at 1347; Def.'s Cross-MSJ App. at 15 (the parties' contract incorporating by reference FAR 52.249-10 which defines excusable delay as, "delay in completing the work aris[ing] from unforeseeable causes beyond the control and without the fault or negligence of the Contractor").

The Court cannot yet decide what excusable delay, if any, plaintiff is entitled to.  *See supra* Section VI.; Tr. at 207:13–20 (plaintiff's counsel stating the total days of excusable delay, if any, is to be determined post-summary judgment).  A compensable delay analysis requires the Court to look at each specific instance of excusable delay plaintiff is entitled to and determine if the government is "the sole proximate cause of [plaintiff]'s additional loss, and the contractor would not have been delayed for any other reason during that period." *Triax-Pac.*, 958 F.2d at 354.  Consequently, the Court cannot decide whether plaintiff is entitled to any compensable delay until it decides if plaintiff is entitled to excusable delay.  *Id.*  Further, the government's blanket assertion that any excusable delay caused by weather, logs, clay, or debris was concurrent with plaintiff's delayed start, defective equipment, project planning, and personnel management is unavailing because it does not assess each specific instance of excusable delay to which plaintiff is entitled.  *Id.*; *see* Def.'s Cross-MSJ at 26; *Catel, Inc.*, 2012 WL 3104366, at *33 (quoting *CJP Contractors, Inc. v. United States*, 45 Fed. Cl. 343, 372 (1999)) ("[I]n the event of concurrent delays, the contractor 'can attempt to prove the portion of the delay attributable to the government[] that was separate and apart from the contractor's delay.'").  The government correctly states, and plaintiff acknowledges, plaintiff "has the burden of establishing by a preponderance of the evidence" the existence of any excusable delay, compensable or otherwise.  *Morganti Nat., Inc.*, 49 Fed. Cl. at 132; Tr. at 210:6–10 (plaintiff's counsel agreeing "the burden is on plaintiff to demonstrate that any compensable delays are, in fact, sequential and not concurrent with plaintiff's own delays").  Plaintiff did not motion for summary judgment on its compensable delay claims, so it has not yet attempted to establish which of its delays are compensable.  *Celotex*, 477 U.S. at 322 (A party seeking summary judgment bears the burden of establishing the "absence of any genuine issues of material fact").  Therefore, the Court denies the government's motion for summary judgment on this issue and will defer deciding whether plaintiff is entitled to any compensable delay until after trial.  *Id.*

## VIII.   Whether the Government is Entitled to Recover Costs and Damages

Both plaintiff and the government move for summary judgment on the government's counterclaims for reprocurement costs, administrative costs, and liquidated damages.  Pl.'s MSJ at 1–2; Def.'s Cross-MSJ at 46–50; Tr. at 129:1–15, 212:7–20 (government counsel confirming its counterclaims fail if plaintiff has a valid defense to default).

A.        Whether the Government May Recover Reprocurement Costs

Plaintiff argues the government is barred from seeking reprocurement costs because it "made substantial and material changes in the physical nature of the work to be performed from the original contract to the re-let contract." Pl.'s MSJ at 24. In the resolicitation contract, plaintiff asserts the government moved the disposal locations, changed the equipment that could be used, lowered the quantity of the material to be removed, and added notice of debris, weather logs, clay, and sunken vessels. *Id.*; Pl.'s Reply at 11–13 (describing the thirty changes to the resolicitation). Plaintiff also claims the government paid a portion of its reprocurement costs to the reprocurement contractor in bad faith. Pl.'s Reply at 13 ("USACE paid the reprocurement contractor $262,500 when they were only able to verify that $189,465 dollars was due to the [c]ontractor." (citing Ex. W at 18 (internal USACE emails regarding the reprocurement contractor's equitable adjustment claim)).

The government points out that plaintiff does not dispute that it actually incurred its claimed costs and denies that it made "substantial and material changes" to its reprocurement contract. Def.'s Cross-MSJ at 46–47. The government states, "[t]he purpose of both the reprocurement and [plaintiff's] contract was to complete the same dredging work at the same project site, with no substantial or material changes 'to the work to be performed.'" *Id.* at 47 (quoting Pl.'s MSJ at 20). The government argues the changes plaintiff identifies are "minor technical changes." *Id.* These changes did not impact the dredging work and had no impact on the contract price, according to the government. *Id.* (citing *Seaboard Lumber Co. v. United States*, 308 F.3d 1283, 1301 (Fed. Cir. 2002)); Def.'s Reply at 23 ("[Plaintiff] ignores that the reprocurement contract cost nearly $7,000 less than the contract awarded to MIC."). The government lastly states no such bad faith payment occurred—"USACE and the contractor ultimately reached a compromise for a net increase of only $2,392.50 over the original contract price." *Id.* at 24.

The parties' contract in this case incorporates by reference FAR 52.249-10(a), which states a "[c]ontractor . . . shall be liable for any damage to the [g]overnment resulting from the [c]ontractor's . . . failure to complete the work within the specified time . . . . This liability includes any increased costs incurred by the [g]overnment in completing the work." *See* Def.'s Cross-MSJ App. at 15 (the 2014 contract). Under a claim for excess reprocurement costs, "[t]he measure of damages is the reasonable reprocurement price less the original contract price." *Cascade Pac. Int'l v. United States*, 773 F.2d 287, 293 (Fed. Cir. 1985); *see Armour of Am.*, 96 Fed. Cl. at 761–62 (citation omitted) ("In calculating excess reprocurement costs, '[t]he measure of the [g]overnment's damage is the difference between what it cost it to do the work and what it would have cost it to do the work had the appellant not been terminated for default.'"); *see also Gen. Dynamics Corp. v. United States*, 671 F.2d 474, 480 (Ct. Cl. 1982) (concluding that if a plaintiff breached its contract, the government is entitled to the costs of reprocurement which exceeded the amount for which the plaintiff was obligated to perform). The government may recover excess reprocurement costs only when it shows: "(1) the reprocured [services] are the same as or similar to those involved in the termination; (2) the [g]overnment actually incurred excess costs; and (3) the [g]overnment acted reasonably to minimize the excess costs resulting from the default." *Cascade Pac. Int'l*, 773 F.2d at 294 (citations omitted). The first factor is demonstrated by comparing the original contract with the reprocurement contract. *Id.* (citation

omitted).  The Court may deny the government its reprocurement costs when it has made "substantial and material changes in the physical nature of the performance, *i.e.*, the work to be performed . . . , from the original contract to the re[procurement] contract."  *Seaboard Lumber Co.*, 308 F.3d at 1298 (citation omitted).  Plaintiff bears "the burden of proving the effects of changes in the reprocurement contract terms on the contract price."  *Id.* at 1301.  The second factor merely "requires the [g]overnment to show what it spent in reprocurement."  *Cascade Pac. Int'l*, 773 F.2d at 294 (citation omitted).  "The third condition requires that the [g]overnment act within a reasonable time of the default, use the most efficient method of reprocurement, obtain a reasonable price, and mitigate its losses."  *Id.* (footnote omitted).

Regarding the first element, plaintiff identifies thirty changes the government made between its contract in 2014 and the reprocurement contract in 2015.  Pl.'s MSJ at 21–22 (comparing Ex. J (2015 resolicitation) and Ex. I (plaintiff's offer on the 2014 solicitation)).  The government added new billing items, changed disposal locations, accelerated the timeline, altered insurance requirements, made past dredging records available, reinserted the warnings it removed in 2014, required a cutterhead and 12" discharge pipe, identified sunken vessels, and more.  *Id.*  The government, no doubt, learned from its experience with plaintiff in 2014.  Tr. at 99:4–5 (government counsel stating, "I'm sure this experience informed [the changes] to some degree.").  The reprocurement reflects "[t]he fact that the government might not have written a perfect contract" in 2014.  Tr. at 215:3–4 (government counsel), 219:19–20 ("Certainly no contract is perfect.  I don't think the Corps was perfect in this case." (government counsel)).  The reprocurement may imply plaintiff was the victim of "an experiment that failed."  Tr. at 199:20 (the Court).  No matter how deserving of sympathy plaintiff may be, however, there is no support for plaintiff's conclusion that the changes it identifies "substantial[ly] and material[ly] change[d]" the work to be performed.  *Seaboard Lumber Co.*, 308 F.3d at 1298.  The two contracts were both for dredging the same waterway in La Push, Washington.  Def.'s Cross-MSJ App. at 131 (cover page of the 2014 solicitation); Ex. J at 1 (cover page of the 2015 resolicitation).  The reprocurement contract required just 3.8% less material to be dredged.  *Compare* Ex. J at 2–4, *with* Ex. I at 3–5 (76,000 cubic yards for the 2015 reprocurement contract, compared to 79,000 for the 2014 contract).  The reprocurement contract cost 0.5% less than the contract awarded to plaintiff.  Def.'s Reply at 23 ("[Plaintiff] ignores that the reprocurement contract cost nearly $7,000 less than the contract awarded to MIC." (citing First Am. Answer to Second Am. Compl. and Countercl. at 9).  Plaintiff makes no attempt to carry its "burden of proving the effects of changes in the reprocurement contract terms on the contract price."  *Seaboard Lumber Co.*, 308 F.3d at 1301.  Plaintiff cannot carry this burden because the same service was performed and for less money—the only difference is the reprocurement contractor had the benefit of learning from plaintiff's failure before undertaking the project.  *Id.*; *Cascade Pac. Int'l*, 773 F.2d at 294.

To support its position, plaintiff cites several cases in which the court held the government was not entitled to excess reprocurement costs due to substantial and material changes to the reprocurement contract.  Pl.'s MSJ at 21–22.  Plaintiff ignores the significant impact on contract price the changes to the original contract had in each of the cases cited.  *Am. Bonding Co. of Baltimore v. United States*, 167 F. 910, 914, 922 (9th Cir. 1909) (finding substantial changes in the contract led to an almost 27% increase in contract price), *aff'd sub*

*nom. United States v. Axman*, 234 U.S. 36 (1914)[14]; *Schwartz v. United States*, 65 F. Supp. 391, 392 (Ct. Cl. 1946) (finding the substantial changes to the contract led to a 192% increase in the reprocurement contract price); *Consol. Airborne Sys., Inc.*, 348 F.2d at 943 (48% increase in unit price); *California Bridge & Constr. Co. v. United States*, 50 Ct. Cl. 40, 54–55 (1915) (the government's excess costs were more than 51% higher than plaintiff's aggregate costs and expected profits), *aff'd sub nom. United States v. California Bridge & Constr. Co.*, 245 U.S. 337 (1917); *Rosenberg v. United States*, 76 Ct. Cl. 662, 669 (1933) (52% increase in contract price); *George Leary Constr. Co. v. United States*, 63 Ct. Cl. 206, 212 (1927) (128% increase in contract price). Plaintiff acknowledged it has "the burden of proving the effects of changes in the reprocurement contract terms on the contract price." Pl.'s MSJ at 19 (citing *Seaboard Lumber Co.*, 308 F.3d at 1301). Inexplicably, plaintiff does not even address the reprocurement contract price; accordingly, plaintiff has failed to demonstrate how any change to the reprocurement contract is substantial or material. *Seaboard Lumber Co.*, 308 F.3d at 1301. The Court finds the reprocured services are similar to that which plaintiff was contracted to perform. *Id.*; *Cascade Pac. Int'l*, 773 F.2d at 294.

As for the second element, the government asserts it incurred excess reprocurement costs totaling $409,345.60. Def.'s Reply at 23 (citing First Am. Answer to Second Am. Compl. and Countercl. at 9) ("Excess reprocurement costs totaling $409,345.60, calculated as the difference between the amounts paid to plaintiff ($416,000) . . . plus the amount paid for the follow-on contract ($1,283,595.50), minus the original contracted amount ($1,290,250)."). Plaintiff does not dispute the government's asserted excess reprocurement costs, likely because the claim amounts to what is effectively a refund of the project mobilization costs the government paid plaintiff up front. Second Am. Compl. Ex. 3 at 1 (the USACE contracting officer's Final Decision on Reprocurement Costs and Demand for Payment); *see also* Def.'s Cross-MSJ App. at 9 (plaintiff's contract showing the project mobilization line item). Further, plaintiff enjoys the benefit of the nearly $7,000 discount the government obtained in reprocuring dredging services because the government subtracts that from its claimed amount owed. Second Am. Compl. Ex. 3 at 1. Accordingly, because this is undisputed, the Court finds the government actually incurred excess costs. *Cascade Pac. Int'l*, 773 F.2d at 294; *see Armour of Am.*, 96 Fed. Cl. at 761–62 (citation omitted) ("In calculating excess reprocurement costs, '[t]he measure of the [g]overnment's damage is the difference between what it cost it to do the work and what it would have cost it to do the work had the [contractor] not been terminated for default.'").

Regarding the third element, plaintiff alleges the government paid the reprocurement contractor $73,035 in bad faith. Pl.'s Reply at 13. The government did not pay the reprocurement contractor the alleged $73,035; rather, the government paid the contractor a

---

[14] Plaintiff argues *United States v. Axman*, 234 U.S. 36 (1914), stands for the proposition that changing disposal locations is a prima facie material change barring recovery of reprocurement costs. Pl.'s MSJ at 20. *Axman* does not take such a bold and narrow position; rather, after the lower court found the change increased price by 27%, the Supreme Court found the disposal location was "an essential and particular term of the contract" which the contractor was required to comply with to satisfy its performance obligations. *Axman*, 234 U.S. at 43. The Supreme Court held the different disposal location was "a material matter . . . different from the contract first entered upon." *Id.* at 45. Given the reprocurement contract price in this case is less than the original, any change in disposal location in the reprocurement must not be "a material matter." *Id.*; *Seaboard Lumber Co.*, 308 F.3d at 1301 (holding plaintiff bears the "burden of proving the effects of changes in the reprocurement contract terms on the contract price").

veritable $2,392.50 due to yardage loss from a dredging boundary change. Def.'s Reply at 24 (citing App. to Def.'s Reply ("Def.'s Reply App.") at 3–4, ECF No. 90 (equitable adjustment to the 2015 contract)). Plaintiff presents no other challenge to the reasonableness of the government's excess reprocurement costs. The government reprocured the dredging services immediately so the reprocurement contractor could begin as soon as the fish window ended and did so for a nearly $7,000 discount. Def.'s Cross-MSJ App. at 524 (2015 contract milestones); Second Am. Compl. Ex. 3 at 1 (the USACE contracting officer's Final Decision on Reprocurement Costs and Demand for Payment). Accordingly, the Court finds "the [g]overnment acted reasonably to minimize the excess costs resulting from the default." *Cascade Pac. Int'l*, 773 F.2d at 294.

Without considering the amount, if any, of reprocurement costs the government is entitled to, or the availability of any remaining defense to this claim, the Court finds no dispute of material fact that the government is entitled to recover its excess reprocurement costs in this case. *Matsushita*, 475 U.S. at 587; *Cascade Pac. Int'l*, 773 F.2d at 294. Accordingly, the Court grants in part the government's motion for summary judgment as to the validity of its claim for reprocurement costs and denies plaintiff's motion for summary judgment on the same. *Seaboard Lumber Co.*, 308 F.3d at 1301; *Cascade Pac. Int'l*, 773 F.2d at 294.

## B.    Whether the Government May Recover Administrative Costs

In addition to excess reprocurement costs, the government seeks to recover its administrative costs. Def.'s Cross-MSJ at 48. The government argues because plaintiff's "excusable delay defenses fail, and because [plaintiff] does not dispute that USACE actually incurred its claimed administrative costs, the [government] is entitled to summary judgment on its claim for those costs as well." *Id.* Plaintiff argues the government has failed to support this claim to administrative costs with any evidence. Pl.'s Reply at 29. The government replies by directing plaintiff to the "USACE's certified demand for payment, signed by the Contracting Officer." Def.'s Reply at 24 (citing Second Am. Compl. Ex. 3 at 2 (the USACE contracting officer's Final Decision on Reprocurement Costs and Demand for Payment)). Plaintiff has possessed and never challenged the government's breakdown of its costs, the government argues. *Id.* (citing Def.'s Reply App. at 6–7 (costs breakdown)).

The parties' contract incorporates by reference FAR 52.249-10(d), which states, "The rights and remedies of the [g]overnment in this clause are in addition to any other rights and remedies provided by law or under this contract." *See* Def.'s Cross-MSJ App. at 15 (the 2014 contract). This court has routinely held, under nearly identical provisions, "the government has the right to seek common law damages for breach of contract following a termination for default." *Tester Corp. v. United States*, 1 Cl. Ct. 370, 376 (1982), *judgment entered,* 1 Cl. Ct. 368 (1983); *see Armour of Am.*, 96 Fed. Cl. at 770; *Marley v. United States*, 423 F.2d 324, 334–35 (Ct. Cl. 1970); *Rumley v. United States*, 285 F.2d 773, 776–77 (Ct. Cl. 1961). The government is therefore "not limited solely to the excess dollar amount paid to the reprocurement contractor, the so-called 'excess costs.'" *Tester Corp.*, 1 Cl. Ct. at 376. Accordingly, the government may seek to recover all damages "that are the foreseeable, direct, natural and proximate results of the breach." *Id.* (citing *William Cramp & Sons Ship & Engine Bldg. Co. v. United States*, 50 Ct. Cl. 179, 191 (1915)); *see Armour of Am.*, 96 Fed. Cl. at 770 (awarding

administrative costs on top of excess reprocurement costs because "the administrative costs which defendant seeks were 'foreseeable, direct, natural and proximate' costs resulting from plaintiff's failure to fulfill its contract"). "It is clear that, properly established, 'administrative costs,' . . . are recoverable in breach of contract cases." *Tester Corp.*, 1 Cl. Ct. at 377 (citing *Se. Airways Corp. v. United States*, 673 F.2d 368, 378–79 (Ct. Cl. 1982) (a termination for default reprocurement damages case which allowed for recovery of "administrative costs")).

The government claims $271,006 in administrative costs, "solely attributable to the [g]overnment effort to obtain a follow-on contract to fulfill the requirements that [plaintiff] failed to perform." Second Am. Compl. Ex. 3 at 2 (the USACE contracting officer's Final Decision on Reprocurement Costs and Demand for Payment). The government states: "This amount does not include the amounts spent to close out the above referenced terminated contract, nor does this amount include the amounts expended in administration of the follow-on contract. The reprocurement was for the same requirement using substantially the same contracting method." *Id.* Plaintiff does not argue the government's administrative costs were unforeseeable, or that they are not the proximate result of its failure to perform the contract. *Armour of Am.*, 96 Fed. Cl. at 770. Prior to bidding on the contract, plaintiff certainly could have foreseen the government would have to reprocure dredging services if it was awarded the contract and failed to perform. *Tester Corp.*, 1 Cl. Ct. at 377. It naturally follows someone would have to dredge the waterway if plaintiff did not. *Id.* The government has limited its administrative costs calculation to only those costs which would be the foreseeable result of plaintiff's breach—*i.e.*, the costs to administer the reprocurement. *Id.*; *Armour of Am.*, 96 Fed. Cl. at 770. The Court accordingly finds the government's administrative costs "[are the] foreseeable, direct, natural and proximate results of" plaintiff's failure to perform under the contract. *Tester Corp.*, 1 Cl. Ct. at 376; *Armour of Am.*, 96 Fed. Cl. at 770. The Court already found plaintiff was in default at termination, *see supra* Section V.; thus, the government may recover its administrative costs in this case. *Tester Corp.*, 1 Cl. Ct. at 377; *Armour of Am.*, 96 Fed. Cl. at 770.

Without considering the amount, if any, of administrative costs the government is entitled to, or the availability of any remaining defense to this claim, the Court finds no dispute of material fact that the government is entitled to recover its administrative costs in this case. *Matsushita*, 475 U.S. at 587; *Tester Corp.*, 1 Cl. Ct. at 377; *Armour of Am.*, 96 Fed. Cl. at 770. Accordingly, the Court grants in part the government's motion for summary judgment as to the validity of its claim for administrative costs and denies plaintiff's motion for summary judgment on the same. *Tester Corp.*, 1 Cl. Ct. at 377; *Armour of Am.*, 96 Fed. Cl. at 770.

## C.    Whether the Government May Recover Liquidated Damages

Liquidated damages are used "to allocate the consequences of a breach before it occurs," *Jennie-O Foods, Inc. v. United States*, 580 F.2d 400, 412 (Ct. Cl. 1978) (per curiam), which "save[s] the time and expense of litigating the issue of damages," *DJ Mfg. Corp. v. United States*, 86 F.3d 1130, 1133 (Fed. Cir. 1996). "When they are fair and reasonable attempts to fix just compensation for anticipated loss caused by breach of contract, they are enforced." *Priebe & Sons v. United States*, 332 U.S. 407, 411 (1947) (citations omitted). Liquidated damages "serve a particularly useful function when damages are uncertain in nature or amount or are unmeasurable, as is the case in many government contracts." *Id.* Conversely, a liquidated

damages clause is unenforceable if it is "plainly without reasonable relation to any probable damage which may follow a breach," *Kothe v. R.C. Taylor Tr.*, 280 U.S. 224, 226 (1930), or is "so extravagant, or disproportionate to the amount of property loss, as to show that compensation was not the object aimed at or as to imply fraud, mistake, circumvention, or oppression," *Wise v. United States*, 249 U.S. 361, 365 (1919). In these circumstances, the liquidated damages clause would amount to an impermissible penalty. *Priebe & Sons*, 332 U.S. at 413; *United States v. Bethlehem Steel Co.*, 205 U.S. 105, 118–21 (1907).

"When presented with a challenge to a liquidated damages clause, a court must judge the clause 'as of the time of making the contract' and without regard to the amount of damages, if any, actually incurred by the nonbreaching party." *K-Con Bldg. Sys., Inc. v. United States*, 97 Fed. Cl. 41, 50 (2011) (first citing *Priebe & Sons*, 332 U.S. at 412; and then citing *Bethlehem Steel Co.*, 205 U.S. at 119 (noting courts will enforce liquidated damages clauses "without proof of the damages actually sustained")). The party challenging a liquidated damages provision bears a "heavy" burden, and "it is generally improper for a court 'to inquire into the process that the contracting officer followed in arriving at the liquidated damages figure that was put forth in the solicitation and agreed to in the contract.'" *Id.* (citing *DJ Mfg. Corp.*, 86 F.3d at 1134–37). "That burden is an exacting one, because when damages are uncertain or hard to measure, it naturally follows that it is difficult to conclude that a particular liquidated damages amount or rate is an unreasonable projection of what those damages might be." *DJ Mfg. Corp.*, 86 F.3d at 1134. If it is "certain when the contract was made [and] later proved to be" that a breach "would not occasion damage," however, then the liquidated damages clause is not "a fair estimate of damages to be suffered but . . . serve[s] only as an added spur to performance." *Priebe & Sons*, 332 U.S. at 413. Such an arrangement is unenforceable. *Id.*

## 1. Whether the Government is Entitled to Liquidated Damages Charged Between 1 March 2015 and 31 August 2015

Plaintiff argues the government is not entitled to liquidated damages during the fish window because, "[b]y law and contractual limitation, no work could legally be done between March 1 and August 31." Pl.'s MSJ at 83. Plaintiff asserts, "[c]omputing damages for monitoring on-site work for a known time period where on-site work is prohibited by law and the contract is without reasonable relation to any probable damage which may follow a breach for that time period." *Id.* at 84. There are no costs during the fish window, according to plaintiff, so applying liquidated damages during that period would be "a mistake and oppressive." *Id.*; Pl.'s Reply at 28 (also characterizing the damages as a penalty and punitive).

The government responds by stating "the work window was well known 'as of the time of making the contract,' and the liquidated damages provision did not exempt time outside of that period from damages accrual." Def.'s Cross-MSJ at 50. The government argues there is "no evidence to suggest the provision is an impermissible penalty, as opposed to a 'reasonable forecast of just compensation for breach of contract,' intended to account for the time, cost, reputational harm, and any other difficulties that USACE might reasonably expect to encounter if [plaintiff] failed to complete the project." *Id.* (citing *K-Con Bldg. Sys., Inc.*, 97 Fed. Cl. at 49). The liquidated damages accrual during the fish window is not intended to account for "monitoring on-site work," Def.'s Reply at 25 (quoting Pl.'s Reply at 28), according to the

government; rather, they are "a pre-agreed remedy 'without regard to the amount of damages, if any, actually incurred by the nonbreaching party.'" *Id.* (quoting *K-Con Bldg. Sys., Inc.*, 97 Fed. Cl. at 50).

The contract's liquidated damages provision states:

(a) If the [c]ontractor fails to complete the work within the time specified in the [c]ontract, or any extension, the [c]ontractor shall pay to the [g]overnment as liquidated damages, the sum of $1,400.00 for each day of delay until the work is completed or accepted.
(b) If the [g]overnment terminates the [c]ontractor's right to proceed, the resulting damages will continue to accrue until the work is completed. These liquidated damages are in addition to excess cost of repurchase . . . .

Def.'s Cross-MSJ App. at 40 (the 2014 contract). The contract also provided for all work to be completed before 1 March 2015, to accommodate for "the fish window . . . [a] period where dredging cannot occur because of the environmental concerns." Tr. at 111:8–112:2 (government counsel); *see* Def.'s Cross-MSJ App. at 276 (the 2014 solicitation limiting the work window). The reprocurement contract similarly accounted for the fish window, as it prohibited any dredging before 1 September 2015. *See* Ex. J at 79 (the resolicitation). "No[ one is] arguing that dredging should have occurred during the fish window." Tr. at 111:25–112:2 (the Court, to which government counsel responded: "Correct."). Yet despite the total bar on any dredging activity, the liquidated damages clause is silent as to the fish window, so the government seeks to recover $257,600 in liquidated damages for this period. *See* Def.'s Cross-MSJ App. at 40 (the 2014 contract); Def.'s Cross-MSJ at 49.

The government estimated the $1,400 per day liquidated damages figure based on the labor and travel costs the government would incur while a contractor was on-site dredging material. *See* Ex. A at 9 (deposition of USACE project manager John Pell at 58:21–59:7 (excerpts)); Bowser Decl. Ex. 19, ECF No. 80-12 (the government estimating its liquidated damages with fairly exact numbers). Plaintiff does not challenge the $1,400 figure, nor does the Court "inquire into the process that the contracting officer followed in arriving at the liquidated damages figure." *DJ Mfg. Corp.*, 86 F.3d at 1137. What the Court does inquire into is the application of the government's liquidated damages figure. *Priebe & Sons*, 332 U.S. at 412–13. The liquidated damages clause must be "reasonabl[y] relat[ed] to any probable damage which may follow a breach." *Kothe*, 280 U.S. at 226. It is quite clear in this case, however, application of the liquidated damages provision to the fish window is not "reasonabl[y] relat[ed] to any probable damage." *Id.* Rather, the liquidated damages provision serves to compensate the government for additional dredging days it would have to supervise a contractor in the event plaintiff failed to finish on time. Ex. 19 (liquidated damages calculation). No such dredging or supervision could occur during the fish window; therefore, the liquidated damages during the fish window are completely unrelated to any probable damage the government could have encountered. *Kothe*, 280 U.S. at 226. Since it was "certain when the contract was made [and] later proved to be" that plaintiff's breach "would not occasion damage" during the fish window, the liquidated damages provision cannot be applied between 1 March and 31 August. *Priebe & Sons*, 332 U.S. at 413; *Kothe*, 280 U.S. at 226.

Regarding the government's argument the Court must assess the liquidated damages provision "'as of the time of making the contract' and without regard to the amount of damages, if any, actually incurred by the nonbreaching party[,]" the Court does so here. Def.'s Cross-MSJ at 49 (quoting *K-Con Bldg. Sys., Inc.*, 97 Fed. Cl. at 50). All parties to the contract were well aware of the fish window and the limitations on dredging at the time of contract formation. Def.'s Cross-MSJ App. at 263–65 (water quality certification), 276 (2014 solicitation limiting the work window); Tr. at 111:8–112:2, 217:3–4 (government counsel stating "the fish window was a known factor that existed at the time the liquidated damages provision was implemented."); Def.'s Cross-MSJ at 50 ("[T]he work window was well known 'as of the time of making the contract' . . . ."). The government included the liquidated damages provision to account for its costs, estimated at contract formation, associated with a contractor's performance extending beyond 150 days—not simply for days the waterway remained undredged. *See* Ex. 19 (liquidated damages calculation); Def.'s Cross-MSJ App. at 139 (2014 solicitation). Accordingly, "as of the time of making the contract," it could be determined that accruing $1,400 per day during the fish window, when no dredging could possibly occur, would not actually be associated with "any probable damage which may follow a breach." *Priebe & Sons*, 332 U.S. at 412; *Kothe*, 280 U.S. at 226. The government fails to identify any such probable damage.

The liquidated damages in this case are distinguishable from those discussed in other cases because, here, they are not "uncertain or hard to measure." *DJ Mfg. Corp.*, 86 F.3d at 1134. The government easily calculated what its costs would be per day if plaintiff's performance exceeded the allotted 150 days. *See* Ex. 19 (liquidated damages calculation); Def.'s Cross-MSJ App. at 139 (the 2014 solicitation requiring completion within 150 days). Therefore, "it naturally follows" that applying the liquidated damages clause during the fish window "is an unreasonable projection of what those damages might" have been. *DJ Mfg. Corp.*, 86 F.3d at 1134. The government asserts the liquidated damages clause, regardless of any dredging activity, is simply a "pre-agreed remedy," Def.'s Reply at 25, "intended to account for the time, cost, reputational harm, and any other difficulties th[e] USACE might reasonably expect to encounter."[15] Def.'s Cross-MSJ at 50. While it is possible the government may have encountered some element of harm during the fish window due to plaintiff's breach, the government did not include a liquidated damages provision in the contract to account for that particular harm. *See* Def.'s Cross-MSJ App. at 40 (the 2014 contract liquidated damages clauses). Instead, the government took its relatively certain and measurable liquidated damages for breach during the work window and attempted to claim those for a period of time when such harm was an impossibility. *Priebe & Sons*, 332 U.S. at 411. This liquidated damages claim is

---

[15] At oral argument, the government also asserted liquidated damages are a substitute for the post-award administrative costs it is not claiming. Tr. at 217:17–218:4 ("Mind you, the government did not seek recovery of post-award administrative costs. . . . And they're not being claimed because the parties agree[d] to a liquidated damages provision." (government counsel)). Determining the government is not entitled to liquidated damages during the fish window has only a nominal impact, if any, on the government's ability to recoup its post-award administrative costs, however. The government awarded the resolicitation to the reprocurement contractor on 27 August 2015, just four days before the end of the fish window, and dredging did not begin until 25 September 2015. Def.'s Cross-MSJ App. at 524 (2015 contract milestones). Considering the government is claiming liquidated damages for the entire period between the close of the fish window and completion of the project, the government will still likely recoup its post-award administrative costs, as this finding only eliminates four days of liquidated damages that were post-award. Def.'s Reply at 25.

"plainly without reasonable relation to any probable damage" that followed plaintiff's breach and arose during the fish window. *Kothe*, 280 U.S. at 226. The liquidated damages clause as applied to the fish window is not "a fair estimate of damages to be suffered but . . . serve[s] only as an added spur to performance." *Priebe & Sons*, 332 U.S. at 413; *Kothe*, 280 U.S. at 226.

The Court finds no dispute of material fact; the government is not entitled to recover under the liquidated damages clause between 1 March 2015 and 31 August 2015. *Priebe & Sons*, 332 U.S. at 413; *Matsushita*, 475 U.S. at 587. Accordingly, the Court grants plaintiff's motion for summary judgment and denies the government's motion for summary judgment on this issue. *Priebe & Sons*, 332 U.S. at 413; *Kothe*, 280 U.S. at 226; *Wise*, 249 U.S. at 365; *DJ Mfg. Corp.*, 86 F.3d at 1134.

### 2.     Whether the Government is Entitled to the Remainder of its Liquidated Damages

The government argues because plaintiff "poses no separate challenge" to the accrual of liquidated damages outside of the fish window, the government "is entitled to at least the $93,800 in liquidated damages for the 67 days between [plaintiff's] termination for default and the reprocurement contract completion that are outside of the time period that [plaintiff] separately contests." Def.'s Cross-MSJ at 49. Plaintiff argues the government is not entitled to the remainder of its liquidated damages claim because the termination for default was improper. Pl.'s Reply at 27 (citing its various motions for summary judgment).

The government arrived at the $1,400 per day figure by estimating the labor and travel costs the government would incur while a contractor was on-site dredging material. *See* Ex. A at 9 (deposition of USACE project manager John Pell at 58:21–59:7 (excerpts)); Ex. 19 (the government estimating its liquidated damages with fairly exact numbers). Plaintiff does not challenge the $1,400 figure or its application to the period of time outside the fish window. The liquidated damages clause, as applied outside the fish window, is "reasonabl[y] relat[ed] to any probable damage which may follow a breach" because it is tied to damages the parties could have anticipated the government would face as a consequence of having to supervise the reprocurement contractor while it dredged the waterway. *Kothe*, 280 U.S. at 226; *see* Ex. A at 9 (deposition of USACE project manager John Pell at 58:21–59:7 (excerpts)); Ex. 19 (liquidated damages calculation). As applied to the work window, the liquidated damages clause is a "fair and reasonable attempt[] to fix just compensation for anticipated loss caused by breach of contract." *Priebe & Sons*, 332 U.S. at 411. Plaintiff presents no challenge to the reasonableness of the liquidated damages provision as applied to the work window, so plaintiff has not met its "heavy" burden. *K-Con Bldg. Sys., Inc.*, 97 Fed. Cl. at 50 (citing *DJ Mfg. Corp.*, 86 F.3d at 1134). Accordingly, the Court finds the government's liquidated damages figure, as applied outside the fish window, is a "fair and reasonable attempt[] to fix just compensation for anticipated loss caused by breach of contract," and is therefore enforceable. *Priebe & Sons*, 332 U.S. at 411; *Kothe*, 280 U.S. at 226.

Without considering the amount, if any, of liquidated damages the government is entitled to, or the availability of any remaining defense to this claim, the Court finds no dispute of material fact the government is entitled to recover under the liquidated damages provision for the

period of time outside the fish window. *Matsushita*, 475 U.S. at 587; *Priebe & Sons*, 332 U.S. at 411. Accordingly, the Court grants in part the government's motion for summary judgment on the validity of its claim to liquidated damages outside the fish window and denies plaintiff's motion for summary judgment on the same. *Priebe & Sons*, 332 U.S. at 413; *Kothe*, 280 U.S. at 226; *Wise*, 249 U.S. at 365; *DJ Mfg. Corp.*, 86 F.3d at 1134.

## IX.    Conclusion

For the reasons discussed *supra*, the Court **GRANTS IN PART and DENIES IN PART** plaintiff's motion for summary judgment and **GRANTS IN PART and DENIES IN PART** the government's cross-motion for summary judgment. The parties **SHALL FILE** a joint status report proposing a timeline for further proceedings consistent with this opinion on or before **17 March 2022**. Accordingly, the Court finds this perfect storm has not yet concluded.

**IT IS SO ORDERED.**

<u>s/ Ryan T. Holte</u>
RYAN T. HOLTE
Judge